# CHAN ET AL. *v.* KOREAN AIR LINES, LTD.

No. 87–1055.   Argued December 7, 1988—Decided April 18, 1989

Scalia, J., delivered the opinion of the Court, in which Rehnquist, C. J., and White, O'Connor, and Kennedy, JJ., joined. Brennan, J., filed an opinion concurring in the judgment, in which Marshall, Blackmun, and Stevens, JJ., joined, *post*, p. 136.

*Milton G. Sincoff* argued the cause for petitioners. With him on the brief were *Steven R. Pounian* and *Donald W. Madole.*

*Richard J. Lazarus* argued the cause for the United States as *amicus curiae* urging reversal. With him on the brief were *Solicitor General Fried, Assistant Attorney General Bolton,* and *Deputy Solicitor General Ayer.*

*George N. Tompkins, Jr.,* argued the cause and filed a brief for respondent.

Justice Scalia delivered the opinion of the Court.

This case presents the question whether international air carriers lose the benefit of the limitation on damages for passenger injury or death provided by the multilateral treaty known as the Warsaw Convention if they fail to provide notice of that limitation in the 10-point type size required by a private accord among carriers, the Montreal Agreement.

I

On September 1, 1983, over the Sea of Japan, a military aircraft of the Soviet Union destroyed a Korean Air Lines, Ltd. (KAL), Boeing 747 en route from Kennedy Airport in New York to Seoul, South Korea. All 269 persons on board the plane perished. Survivors of the victims filed wrongful-death actions against KAL in several Federal District Courts, all of which were transferred for pretrial proceedings to the District Court for the District of Columbia pursuant to 28 U. S. C. § 1407. All parties agree that their rights are governed by the Warsaw Convention, a multilateral treaty

governing the international carriage of passengers, baggage, and cargo by air. Convention for the Unification of Certain Rules Relating to International Transportation by Air, Oct. 12, 1929, 49 Stat. 3000, T. S. No. 876 (1934), reprinted in note following 49 U. S. C. App. § 1502.

The present controversy centers on the per passenger damages limitation for personal injury or death. This was fixed at approximately $8,300 by the Convention, but was raised to $75,000 by the Montreal Agreement, an agreement among carriers executed (and approved by the Civil Aeronautics Board (CAB)) in 1966, and joined by KAL in 1969. Agreement Relating to Liability Limitations of the Warsaw Convention and the Hague Protocol, CAB Agreement 18900, note following 49 U. S. C. App. § 1502 (approved by CAB Order E–23680, May 13, 1966, 31 Fed. Reg. 7302). In addition to providing for a higher damages limitation, this agreement required carriers to give passengers written notice of the Convention's damage limitations in print size no smaller than 10-point type. The notice of the Convention's liability rules printed on KAL's passenger tickets for the flight in question here appeared in only 8-point type. By motion for partial summary judgment, plaintiffs sought a declaration that this discrepancy deprived KAL of the benefit of the damages limitation.

On July 25, 1985, the District Court for the District of Columbia denied the motion, finding that neither the Warsaw Convention nor the Montreal Agreement prescribes that the sanction for failure to provide the required form of notice is the elimination of the damages limitation. *In re Korean Air Lines Disaster of September 1, 1983*, 664 F. Supp. 1463. Its opinion specifically considered and rejected contrary Second Circuit precedent. See *In re Air Crash Disaster at Warsaw, Poland, on March 14, 1980*, 705 F. 2d 85, cert. denied *sub nom. Polskie Linie Lotnicze* v. *Robles*, 464 U. S. 845 (1983). On September 24, 1985, the District Court certified for interlocutory appeal under 28 U. S. C. § 1292(b) (1982 ed., Supp.

IV) the question whether KAL "is entitled to avail itself of the limitation of damages provided by the Warsaw Convention and Montreal Agreement despite its defective tickets." The District of Columbia Circuit allowed the appeal and (following a remand of the record for clarification of the scope of the District Court's order) affirmed, adopting the District Court's opinion in full. *In re Korean Air Lines Disaster of September 1, 1983*, 265 U. S. App. D. C. 39, 829 F. 2d 1171 (1987). We granted certiorari, 485 U. S. 986 (1988), to resolve the conflict among the Courts of Appeals. (In addition to the Second Circuit, the Fifth is in disagreement with the District of Columbia Circuit's resolution here. See *In re Air Crash Disaster Near New Orleans, Louisiana, on July 9, 1982*, 789 F. 2d 1092 (1986), reinstated, 821 F. 2d 1147 (1987) (en banc).)

## II

Petitioners concede that by itself the Montreal Agreement imposes no sanction for failure to comply with its 10-point type requirement.[1] They argue, however, that such a re-

---

[1] The relevant portion of the Montreal Agreement provides:

"2. Each carrier shall, at the time of delivery of the ticket, furnish to each passenger whose transportation is governed by the Convention . . . the following notice, which shall be printed in type at least as large as 10 point and in ink contrasting with the stock on (i) each ticket; (ii) a piece of paper either placed in the ticket envelope with the ticket or attached to the ticket; or (iii) on the ticket envelope:

"ADVICE TO INTERNATIONAL PASSENGER ON
LIMITATION OF LIABILITY

"Passengers on a journey involving an ultimate destination or a stop in a country other than the country of origin are advised that the provisions of a treaty known as the Warsaw Convention may be applicable to the entire journey, including any portion entirely within the country of origin or destination. For such passengers on a journey to, from, or with an agreed stopping place in the United States of America, the Convention and special contracts of carriage embodied in applicable tariffs provide that the liability of certain (name the carrier) and certain other[*] carriers parties to such special contracts for death of or personal injury to passengers is limited in most cases to proven damages not to exceed US $75,000 per passenger, and that this liability up to such limit shall not depend on negligence on

quirement is created by reading the Montreal Agreement in conjunction with the Warsaw Convention. This argument proceeds in two steps. First, petitioners assert that Article 3 of the Warsaw Convention removes the protection of limited liability if a carrier fails to provide adequate notice of the Convention's liability limitation in its passenger tickets. Second, they contend that the Montreal Agreement's 10-point type requirement supplies the standard of adequate notice under Article 3. Because we reject the first point, we need not reach the second.[2]

Article 3 of the Warsaw Convention provides:

"(1) For the transportation of passengers the carriers must deliver a passenger ticket which shall contain the following particulars:

"*(a)* The place and date of issue;

"*(b)* The place of departure and of destination;

_____

the part of the carrier. For such passengers travelling by a carrier not a party to such special contracts or on a journey not to, from, or having an agreed stopping place in the United States of America, liability of the carrier for death or personal injury to passengers is limited in most cases to approximately US $8,290 or US $16,580.

"The names of Carriers parties to such special contracts are available at all ticket offices of such carriers and may be examined on request.

"Additional protection can usually be obtained by purchasing insurance from a private company. Such insurance is not affected by any limitation of the carrier's liability under the Warsaw Convention or such special contracts of carriage. For further information please consult your airline or insurance company representative.

"[*] Either alternative may be used." Aeronautical Statutes and Related Materials 515 (compiled by Office of General Counsel, CAB, 1974).

[2] For a similar reason, we need not discuss Department of Transportation (formerly CAB) Economic Regulation Part 221, 14 CFR § 221.175(a) (1988), which was originally promulgated in 1963, before the Montreal Agreement, and which contains a similar requirement of 10-point type. This imports no sanctions of its own except a civil penalty, see 49 U. S. C. App. § 1471. Thus, even if *(per impossibile)* the Executive Branch could unilaterally prescribe what adequate notice under an international treaty consists of, the sanction of invalidating the damages limitations would still be lacking.

*"(c)* The agreed stopping places, provided that the carrier may reserve the right to alter the stopping places in case of necessity, and that if he exercises that right, the alteration shall not have the effect of depriving the transportation of its international character;

*"(d)* The name and address of the carrier or carriers;

*"(e)* A statement that the transportation is subject to the rules relating to liability established by this convention.

"(2) The absence, irregularity, or loss of the passenger ticket shall not affect the existence or the validity of the contract of transportation, which shall none the less be subject to the rules of this convention. Nevertheless, if the carrier accepts a passenger without a passenger ticket having been delivered he shall not be entitled to avail himself of those provisions of this convention which exclude or limit his liability."

Although Article 3(1)*(e)* specifies that a passenger ticket shall contain "[a] statement that the transportation is subject to the rules relating to liability established by this convention," nothing in Article 3 or elsewhere in the Convention imposes a sanction for failure to provide an "adequate" statement. The only sanction in Article 3 appears in the second clause of Article 3(2), which subjects a carrier to unlimited liability if it "accepts a passenger without a passenger ticket having been delivered." Several courts have equated nondelivery of a ticket, for purposes of this provision, with the delivery of a ticket in a form that fails to provide adequate notice of the Warsaw limitation. See *In re Air Crash Disaster Near New Orleans, Louisiana, on July 9, 1982, supra; In re Air Crash Disaster at Warsaw, Poland, on March 14, 1980,* 705 F. 2d 85 (CA2), cert. denied *sub nom. Polskie Linie Lotnicze* v. *Robles,* 464 U. S. 845 (1983); *Deutsche Lufthansa Aktiengesellschaft* v. *CAB,* 156 U. S. App. D. C. 191, 196–197, 479 F. 2d 912, 917–918 (1973); *Lisi* v. *Alitalia-Linee Aeree Italiane, S. p. A.,* 370 F. 2d 508 (CA2 1966), aff'd by

equally divided Court, 390 U. S. 455 (1968); *Egan* v. *Kollsman Instrument Corp.*, 21 N. Y. 2d 160, 234 N. E. 2d 199 (1967), cert. denied, 390 U. S. 1039 (1968). See also *Warren* v. *Flying Tiger Line, Inc.*, 352 F. 2d 494 (CA9 1965) (conditioning liability limitation upon delivery of tickets in such manner as to afford passengers a reasonable opportunity to take measures to protect against liability limitation); *Mertens* v. *Flying Tiger Line, Inc.*, 341 F. 2d 851 (CA2) (same), cert. denied, 382 U. S. 816 (1965). But see *Ludecke* v. *Canadian Pacific Airlines, Ltd.*, 98 D. L. R. 3d 52, 57 (Can. 1979) (rejecting the view of the American cases).

We cannot accept this interpretation. All that the second sentence of Article 3(2) requires in order to avoid its sanction is the "deliver[y]" of "a passenger ticket." Expanding this to mean "a passenger ticket in compliance with the requirements of this Convention" is rendered implausible by the first sentence of Article 3(2), which specifies that "[t]he . . . irregularity . . . of the passenger ticket shall not affect the existence or the validity of the contract of transportation, which shall none the less be subject to the rules of this convention." It is clear from this (1) that an "irregularity" does not prevent a document from being a "passenger ticket"; and (2) that an "irregularity" in a passenger ticket does not eliminate the contractual damages limitation provided for by the Convention. "Irregularity" means the "[q]uality or state of not conforming to rule or law," Webster's Second International Dictionary (1950), and in the present context the word must surely refer to the rules established by the Convention, including the notice requirement. Thus, a delivered document does not fail to qualify as a "passenger ticket," and does not cause forfeiture of the damages limitation, merely because it contains a defective notice. When Article 3(2), after making this much clear, continues (in the second sentence) "Nevertheless, if a carrier accepts a passenger without a passenger ticket having been delivered, etc.," it can only be referring to the carrier's failure to deliver any document whatever, or its

delivery of a document whose shortcomings are so extensive that it cannot reasonably be described as a "ticket" (for example, a mistakenly delivered blank form, with no data filled in). Quite obviously, the use of 8-point type instead of 10-point type for the liability limitation notice is not a shortcoming of such magnitude; indeed, one might well select that as a polar example of what could not possibly prevent a document from being a ticket.[3]

---

[3] JUSTICE BRENNAN accuses us of being "disingenuous" in saying that this is the only possible reading of Article 3. In the single paragraph supporting this accusation, he offers two arguments to show that Article 3 is "surely susceptible," *post*, at 137, of another interpretation. First, he thinks it "not at all unreasonable to read the term 'passenger ticket,' when used . . . in Article 3(2)" to mean, *not* what it meant in Article 3(1), but rather to be a "shorthand for [the] longer phrase" consisting of *all* the requirements that Article 3(1) says a passenger ticket must contain. It seems to us that this suggested reading *is* unreasonable—not only because no sensible draftsman would use such strange "shorthand" instead of referring, in Article 3(2), to *"such a* passenger ticket" rather than simply "passenger ticket," but also because the result produced by the suggested reading is nonsensical. The effect of the concurrence's exegesis can be assessed by substituting for the phrase "the passenger ticket" in Article 3(2) the phrase "a regular passenger ticket"—by which we mean (as does the concurrence) a ticket in full compliance with Article 3(1). The first sentence of Article 3(2) then reads, in relevant part: "The . . . irregularity . . . of a regular passenger ticket shall not affect the existence or the validity of the contract of transportation." The only way out of this absurdity is to posit that by "irregularity" Article 3(2) means something other than failure to comply with all the requirements of Article 3(1)—but there is no plausible "something other."

JUSTICE BRENNAN's second argument is that the first sentence of Article 3(2) *"quite clearly,"* post, at 137 (emphasis in original), does not have the meaning we have described. As he reads that sentence, when it says that an irregular ticket "shall none the less be subject to the rules of this convention" it means to include among those "rules" the rule of the second sentence, that (as he interprets it) if a "regular passenger ticket" is not delivered the rule limiting liability does not apply. Though this is put forward as a separate argument, it obviously assumes the correctness of the first one, since if "passenger ticket" in the second sentence does not mean a "regular passenger ticket" the "rule" of that second sentence does not

Besides being incompatible with the language of the Convention, the proposition that, for purposes of Article 3(2), delivering a defective ticket is equivalent to failure to deliver a ticket, produces absurd results. It may seem reasonable enough that a carrier "shall not be entitled to avail himself of those provisions of this convention which exclude or limit his liability" when the ticket defect consists precisely of a failure to give the passenger proper notice of those provisions. But there is no textual basis for limiting the "defective-ticket-is-no-ticket" principle to that particular defect. Thus, the liability limitation would also be eliminated if the carrier failed to comply, for example, with the requirement of Article 3(1)*(d)* that the ticket contain the address of the carrier.

The conclusion that defective compliance with the notice provision does not eliminate the liability limitation is confirmed by comparing Article 3(2) with other provisions of the Convention. Article 3 is a part of Chapter II of the Conven-

---

apply to the delivery of an "irregular" ticket, as opposed to the delivery of no ticket at all. Quite apart from that flaw, however, it is impossible to read the second sentence as setting forth a "rule" that is included among the "rules" referred to in the first sentence, because that second sentence begins with the word "Nevertheless." It sets forth an *exception* to the operation of the first sentence—not a specification of something already included within it. The latter would be conveyed, not by a new sentence beginning "Nevertheless," but by a new clause beginning "including the rule that." As written, the second sentence plainly conveys the meaning that if the reason for the "absence" of a passenger ticket (covered by the first sentence) is that a passenger ticket *was never delivered*, the carrier shall "nevertheless"—*despite* the first sentence—be unable to avail himself of the rules excluding or limiting liability.

We may note that the alternative interpretation the concurrence believes it sees in the text—which would render the omission of any single particular listed in Article 3(1) a basis for imposing the sanction of the second sentence of Article 3(2)—is evidently not an interpretation that the concurrence itself is prepared to adopt, since it finds that to have been quite plainly rejected by the drafters. See *post*, at 146–147. Ultimately, then, even on its own terms the concurrence does not use the drafting history to resolve an ambiguity but rather to depart from any possible reading of the Treaty.

tion, entitled "Transportation Documents." Just as Section I of that Chapter (which includes Article 3) specifies what information must be included in passenger tickets, Sections II and III specify what information must be included in, respectively, baggage checks and air waybills for cargo. All three sections require, in identical terms, "[a] statement that the transportation is subject to the rules relating to liability established by this convention." Articles 3(1)*(e)*, 4(2)*(h)*, 8*(q)*. All three sections also provide, again in identical terms, that if the relevant document (ticket, baggage check, or air waybill) has not been delivered (or, in the case of air waybill, "made out"), the carrier "shall not be entitled to avail himself of the provisions of this convention which exclude or limit his liability." Articles 3(2), 4(4), and 9. But, *unlike Section I*, Sections II and III also specifically impose the latter sanction for failure to include in the documents certain particulars, including (though not limited to) the notice of liability limitation.[4] Sections II and III thus make doubly clear what the

---

[4] The relevant provisions of Sections II and III are as follows:

"SECTION II. BAGGAGE CHECK

"*Article 4*

. . . . .

"(3) The baggage check shall contain the following particulars:

"*(a)* The place and date of issue;

"*(b)* The place of departure and of destination;

"*(c)* The name and address of the carrier or carriers;

"*(d)* The number of the passenger ticket;

"*(e)* A statement that delivery of the baggage will be made to the bearer of the baggage check;

"*(f)* The number and weight of the packages;

"*(g)* The amount of the value declared in accordance with article 22(2);

"*(h)* A statement that the transportation is subject to the rules relating to liability established by this convention.

"(4) The absence, irregularity, or loss of the baggage check shall not affect the existence or the validity of the contract of transportation which shall none the less be subject to the rules of this convention. Nevertheless, if the carrier accepts baggage without a baggage check having been delivered, or if the baggage check does not contain the particulars set out

text of Article 3(2) already indicates: that delivery of a defective document is something quite different from failure to deliver a document.   And given the parallel structures of these provisions it would be a flouting of the text to imply in

at *(d)*, *(f)*, and *(h)* above, the carrier shall not be entitled to avail himself of those provisions of the convention which exclude or limit his liability.

### "SECTION III.  AIR WAYBILL

#### *"Article 8*

"The air waybill shall contain the following particulars:

*"(a)* The place and date of its execution;

*"(b)* The place of departure and of destination;

*"(c)* The agreed stopping places, provided that the carrier may reserve the right to alter the stopping places in case of necessity, and that if he exercies that right the alteration shall not have the effect of depriving the transportation of its international character.

*"(d)* The name and address of the consignor;

*"(e)* The name and address of the first carrier;

*"(f)* The name and address of the consignee, if the case so requires;

*"(g)* The nature of the goods;

*"(h)* The number of packages, the method of packing, and the particular marks or numbers upon them;

*"(i)* The weight, the quantity, the volume, or dimensions of the goods;

*"(j)* The apparent condition of the goods and of the packing;

*"(k)* The freight, if it has been agreed upon, the date and place of payment, and the person who is to pay it;

*"(l)* If the goods are sent for payment on delivery, the price of the goods, and, if the case so requires, the amount of the expenses incurred;

*"(m)* The amount of the value declared in accordance with article 22(2);

*"(n)* The number of parts of the air waybill;

*"(o)* The documents handed to the carrier to accompany the air waybill;

*"(p)* The time fixed for the completion of the transportation and a brief note of the route to be followed, if these matters have been agreed upon;

*"(q)* A statement that the transportation is subject to the rules relating to liability established by this convention.

#### *"Article 9*

"If the carrier accepts goods without an air waybill having been made out, or if the air waybill does not contain all the particulars set out in article 8 *(a)* to *(i)*, inclusive, and *(q)*, the carrier shall not be entitled to avail himself of the provisions of this convention which exclude or limit his liability."

Section I a sanction not only withheld there but explicitly granted elsewhere. When such an interpretation is allowed, the art of draftsmanship will have become obsolete.

Petitioners and the United States as *amicus curiae* seek to explain the variance between Section I and Sections II and III (as well as the clear text of Article 3) as a drafting error, and lead us through the labyrinth of the Convention's drafting history in an effort to establish this point. It would be absurd, they urge, for defective notice to eliminate liability limits on baggage and air freight but not on personal injury and death. Perhaps not. It might have been thought, by the representatives from diverse countries who drafted the Convention in 1925 and 1929 (an era when even many States of this country had relatively low limits on wrongful-death recovery) that the $8,300 maximum liability established for personal injury or death was a "fair" recovery in any event, so that even if the defective notice caused the passenger to forgo the purchase of additional insurance, he or his heirs would be treated with rough equity in any event. Cf. C. McCormick, Law of Damages § 104 (1935) ("In about one-third of the states, a fixed limit upon the recovery under the Death Act is imposed in the statute. The usual limit is $10,000, but in some instances the maximum is $7,500 or $5,000"). Quite obviously, however, the limitation of liability for baggage and freight (about $16.50 per kilogram, see Article 22(2)) was not set with an eye to fair value (the very notion of a "fair" average value of goods per kilogram is absurd), but perhaps with an eye to fair level of liability in relation to profit on the carriage—so that the shipper of lost goods misled by the inadequate notice would not be compensated equitably. Another possible explanation for the difference in treatment is that the limitations on liability prescribed for baggage and freight are much more substantial and thus notice of them is much more important. They include not just a virtually nominal monetary limit, but also total exclusion of liability for "an error in piloting, in the handling of the aircraft, or in naviga-

tion." Article 20. Or perhaps the difference in treatment can be traced to a belief that people were much more likely, if adequate notice was given, to purchase additional insurance on goods than on their own lives—not only because baggage and freight are lost a lot more frequently than passengers, but also because the Convention itself establishes, in effect, an insurance-purchasing counter at the airport for baggage and freight, providing that if the consignor makes "a special declaration of the value at delivery and has paid a supplementary sum if the case so requires," the carrier will be liable for actual value up to the declared sum. Article 22(2); see also Articles 4*(g)*, 8*(m)*.

These estimations of what the drafters might have had in mind are of course speculation, but they suffice to establish that the result the text produces is not necessarily absurd, and hence cannot be dismissed as an obvious drafting error. We must thus be governed by the text—solemnly adopted by the governments of many separate nations—whatever conclusions might be drawn from the intricate drafting history that petitioners and the United States have brought to our attention. The latter may of course be consulted to elucidate a text that is ambiguous, see, *e. g., Air France* v. *Saks*, 470 U. S. 392 (1985). But where the text is clear, as it is here, we have no power to insert an amendment.[5] As Justice Story wrote for the Court more than a century and a half ago:

---

[5] Even if the text were less clear, its most natural meaning could properly be contradicted only by clear drafting history. It is interesting, therefore, that the concurrence, after performing the examination we consider inappropriate, concludes that it is "impossible to say with certainty what the treatymakers at Warsaw intended." *Post,* at 146. One would think that would be enough to cause the concurrence to resort to the treaty's text. Instead, however, the concurrence shifts to an entirely different mode of analysis—one that it could as well have employed at the outset were it not intent upon demonstrating the technique of pursuing drafting history to a dead end. In its last four pages, the concurrence assumes for the sake of argument that there is an "adequate notice" requirement in the Warsaw Convention—an assumption that it justifies by the fact that

"[T]o alter, amend, or add to any treaty, by inserting any clause, whether small or great, important or trivial, would be on our part an usurpation of power, and not an exercise of judicial functions. It would be to make, and not to construe a treaty. Neither can this Court supply a *casus omissus* in a treaty, any more than in a law. We are to find out the intention of the parties by just rules of interpretation applied to the subject matter; and having found that, our duty is to follow it as far as it goes, and to stop where that stops—whatever may be the imperfections or difficulties which it leaves behind." *The Amiable Isabella*, 6 Wheat. 1, 71 (1821).

For the reasons given above, we agree with the opinion of the Supreme Court of Canada, see *Ludecke* v. *Canadian Pacific Airlines, Ltd.*, 98 D. L. R. 3d 52 (1979), that the Warsaw Convention does not eliminate the limitation on damages for passenger injury or death as a sanction for failure to provide adequate notice of that limitation. Accordingly, we affirm the judgment of the District of Columbia Circuit.

*So ordered.*

---

"[c]ourts in this country have generally read [such a] requirement into the Warsaw Convention." *Post*, at 149. Of course they have read in such a requirement, and of course determining the validity of doing so—rather than assuming it—was the very reason we selected this case for review. The object of our granting writs of certiorari on points of statutory or treaty interpretation is to determine the correctness of fundamental points that lower courts have resolved, not to assume those points to be correct in order to decide particular cases on reasoning useless elsewhere. The concurrence's analysis provides guidance in all cases where notice of liability limitation is provided in 8-point rather than 10-point type. Four-point type, we are told, "may well" yield a different result, see *post*, at 150—always assuming, of course (what the concurrence does not venture to decide) that the Convention contains an "adequate notice" requirement. As for 6-point type, we have no hint whether that might entail liability—if there is any liability for inadequate notice. We choose not to follow a mode of analysis that seems a wasteful expenditure of this Court's time.

JUSTICE BRENNAN, with whom JUSTICE MARSHALL, JUS-
TICE BLACKMUN, and JUSTICE STEVENS join, concurring in
the judgment.

If I may paraphrase Justice Harlan: I agree that the inter-
pretation of the Warsaw Convention advanced by petitioners
should be rejected, but I consider it entitled to a more re-
spectful burial than has been accorded.[1]  Over the last 25
years, petitioners' argument has been accepted, until the
present litigation, by virtually every court in this country
that has considered it.   One such judgment was affirmed
here by an equally divided Court.   It is a view of the Con-
vention that has consistently been adopted by the Executive
Branch, and which is pressed on us in this case by the United
States as *amicus curiae.*   It deserves at least to be stated in
full, and to be considered without the self-affixed blindfold
that prevents the Court from examining anything beyond the
treaty language itself.

The Court holds that the sanction of Article 3(2), which
consists of the loss of the Convention's limitation on liability
under Article 22(1), applies only when no passenger ticket at
all is delivered.   That is a plausible reading, perhaps even
the most plausible reading of the language of the Convention.
But it is disingenuous to say that it is the only possible read-
ing.   Certainly it is wrong to disregard the wealth of evi-
dence to be found in the Convention's drafting history on the
intent of the governments that drafted the document.   It is
altogether proper that we consider such extrinsic evidence of
the treatymakers' intent.   See *Air France* v. *Saks,* 470
U. S. 392, 396, 400 (1985); *Société Nationale Industrielle
Aérospatiale* v. *United States District Court,* 482 U. S. 522,
534 (1987); *Volkswagenwerk Aktiengesellschaft* v. *Schlunk,*
486 U. S. 694, 700–702 (1988).   The drafters of an interna-
tional treaty generally are, of course, the instructed repre-
sentatives of the governments that ultimately ratify the

---

[1] Cf. *Gideon* v. *Wainwright,* 372 U. S. 335, 349 (1963) (Harlan, J.,
concurring).

treaty. The record of their negotiations can provide helpful clues to those governments' collective intent, as it took shape during the negotiating process.[2]

There is strong evidence that the drafters of the Warsaw Convention may have meant something other than what the Court thinks that document says. In the first place, the text of the Convention is surely susceptible of an interpretation other than the Court's. Article 3(1) describes as follows what it is the carrier must deliver: "[A] passenger ticket which shall contain the following particulars . . . ." I think it not at all unreasonable to read the term "passenger ticket," when used subsequently in Article 3(2), as shorthand for this longer phrase. The first sentence of Article 3(2), moreover, *quite clearly* does not have the meaning the Court ascribes to it. *Ante*, at 128. That sentence provides that the "absence, irregularity, or loss" of a ticket shall not affect the validity of the contract, "which shall none the less be subject to the rules of this convention." Those rules include the one laid down in the very next sentence, *i. e.*, the provision for loss of the liability limitation. Thus, there exists a contract even if the ticket is absent or "irregular," and that contract is still governed by *all* of the provisions of the Convention, one of which denies the carrier the benefit of the liability limit under cer-

---

[2] Sometimes, of course, a state may become a party to an international convention only after it has entered into force, without having participated in its drafting. Thus, the United States was not represented at Warsaw and adhered to the Convention only in 1934. But to say that for that reason the drafting history of an international treaty may not be enlisted as an aid in its interpretation would be unnecessarily to forgo a valuable resource. We do not, after all, find it necessary to disregard the drafting history of our Constitution, notwithstanding that 37 of the 50 States played no role in the negotiations and debates that created it.

The United States Senate's consent to the Warsaw Convention was given without any hearings or debate. See *Trans World Airlines, Inc.* v. *Franklin Mint Corp.*, 466 U. S. 243, 273 (1984) (STEVENS, J., dissenting). There is, therefore, no issue in this case as to the proper use of pre-ratification Senate materials in treaty interpretation. Cf. *United States* v. *Stuart*, 489 U. S. 353, 367–368, n. 7 (1989).

tain conditions.[3] The intent of Article 3(2), as a whole, is surely to hold the carrier to the obligations, but to deny it the benefits, of the Convention, if it fails to comply with certain requirements.[4]

Thus, the language of Article 3 does not, to say the least, exclude the interpretation that failure to provide the required notice results in loss of the limitation on liability.[5] On the other hand, the difference between the language of Article 3 and that of Articles 4 and 9 casts some doubt on that

---

[3] Because I think the meaning of this sentence is clear, I must respectfully disagree with the position taken by the Supreme Court of Canada in *Ludecke* v. *Canadian Pacific Airlines, Ltd.*, 98 D. L. R. 3d 52, 57 (1979), which was based on the same erroneous interpretation this Court now gives to the first sentence of Article 3(2).

[4] This intent, which emerges clearly from a careful reading of Article 3(2), is also apparent from the drafting history of the Convention. See, *e. g.*, App. to Brief for United States as *Amicus Curiae* 35a–37a, 47a–49a (hereinafter U. S. App.). (This and subsequent citations to the appendix to the Government's brief are in pairs of page references: the first reference is to the original French document, and the second to an English translation provided by the Solicitor General.)

[5] The Court's difficulty in accepting this point, see *ante*, at 129–130, n. 3, results precisely from the misplaced literalism and disregard of context already evident in its approach to this treaty. Without responding in detail to its literalist critique, I will say this: If one wades through the minutes of the Comité International Technique d'Experts Juridiques Aériens (CITEJA) meetings and of the Warsaw Conference, as well as the various drafts that were produced en route to the final Convention, one finds virtually no support for the Court's theory of what Article 3 means. For the Court's theory of the first sentence of Article 3(2) one finds absolutely none, and plenty that makes it most unlikely that the drafters intended the reading the Court gives. I set out some of this in the text below. For a starter, one might look at the draft of Article 3 presented to the Warsaw Conference, see n. 8, *infra*, where what are now the first and second sentences of Article 3(2) were in completely separate paragraphs, without any "[n]evertheless." Of course the Conference might have decided to make a substantive change, but one searches in vain through its minutes for any indication of such intent. I think it more likely that when the two paragraphs were combined in final drafting the word "[n]evertheless" *("toutefois")* was placed between them as a transition.

reading. Evidence from the drafting history of the Convention is therefore helpful in understanding what the contracting governments intended.

The Convention was drafted between the first and second international conferences on private aviation law, held, respectively, in Paris in 1925 and Warsaw in 1929. The drafting work was done by a committee of experts, CITEJA, and particularly by the committee's Second Commission, during a series of meetings in 1927 and 1928. See generally M. Smirnoff, Le Comité International Technique d'Experts Juridiques Aériens (1936). The text CITEJA presented at the Second International Conference on Private Aviation Law in Warsaw in 1929 was amended in a number of respects before its adoption and submission to the several governments for ratification. Without tracing the evolution of the draft convention in detail, several important themes can be discerned from CITEJA's drafts and minutes.

First, it is abundantly clear that throughout the entire drafting process the delegates intended to apply the same regime of sanctions for failure to comply with the provisions concerning passenger tickets, baggage checks, and air waybills. The initial object of CITEJA's work was the preparation of a convention on the air waybill for the transport of freight. In this phase, its draft contained the requirement that the waybill include various "particulars" (Article 7), as well as a statement that the transportation was subject to the Convention's rules relating to liability (Article 8). The sanction for failure to comply was clear: "If an air waybill containing all the particulars set out in Article 7(a) through (g) and by Article 8 has not been made out for international transportation, the carrier shall still be subject to the rules of the International Convention on liability, but the carrier shall not be entitled to avail himself of those provisions of this Convention that exclude his own liability, release him from responsibility for the errors of his agents, or limit his liability." U. S. App. 43a–44a, 55a–56a.

Subsequently, CITEJA determined to merge the air way-bill convention with proposed modifications to an international liability convention adopted in 1925. *Id.*, at 46a, 58a. At the third session of CITEJA in May 1928, the Second Commission presented a draft convention which, in its Article 3, contained provisions similar to those foreseen for the air waybill in the previous draft. Thus, the passenger ticket was to include four listed particulars, as well as "a statement that the transportation is subject to the rules relating to liability established by this Convention." The same Article, as amended during the session, provided: "If, for international transportation, the carrier accepts a passenger without a passenger ticket having been made out, or if the ticket does not contain the above-mentioned particulars, the contract is still subject to the rules of this Convention, but the carrier shall not be entitled to avail himself of those provisions of this convention which totally or partially exclude his direct liability or liability derived from the negligence of his agents." *Id.*, at 72a, 91a.[6] Similar provisions were adopted in regard to the baggage check. See *id.*, at 76a–77a, 95a–96a. The report submitted by Henry de Vos, Reporter of the Second Committee, to the full CITEJA, made crystal clear the parallelism of approach adopted for the three types of transportation documents: "[T]he sanction for transporting passengers without regular tickets is the same as that for the transportation of baggage and of goods." *Id.*, at 73a, 92a. Similarly, the report Monsieur de Vos prepared on behalf of CITEJA to accompany its final draft of the Convention contained the following observation: "[T]he sanction provided . . . for carriage of passengers without a ticket *or with a ticket not conforming*

---

[6] As originally presented to CITEJA, the triggering clause read: "without a passenger ticket containing the particulars indicated above having been made out." U. S. App. 62a, 82a. The change in language was made in order to exclude the interpretation that the transporter could escape from the obligations of the Convention simply by issuing no passenger ticket at all. See *id.*, at 70a–71a, 90a–91a.

*to the Convention* is identical to that provided . . . for carriage of baggage and goods." Second International Conference on Private Aeronautical Law Minutes 247 (R. Horner & D. Legrez transl. 1975) (emphasis added) (hereinafter Horner & Legrez).[7]

A second observation that can be drawn from the drafting history relates to the purpose of the sanctions clause. This was simply the means chosen by the drafters to compel the air carriers to include on the transportation documents certain "particulars" thought necessary. During the initial stages the drafters had considered requiring the adhering states to impose criminal or civil penalties for failure to comply with the Convention's specifications, but they ultimately accepted a British suggestion that loss of the Convention's benefits should be used as the means of compelling compliance. U. S. App. 35a–36a, 47a–49a, 42a, 54a–55a, 63a, 82a–83a. Thus, the sanction was applied to the failure to include on the transportation documents all of the particulars thought to be essential, but not to certain others whose inclusion was merely recommended. The term "obligatory" was frequently used to refer to the former group. The obligatory particulars were, generally speaking, those relating to the international character of the transportation. *Id.*, at 41a, 54a. These included "[t]he name and address of the carrier." *Id.*, at 43a, 55a. One might today deem that particular unnecessary to demonstrate the international character of the transportation, but that was apparently not the judgment of the drafters, who debated precisely this sort of question, *id.*, at 62a–64a, 82a–83a, and who saw the severe penalty as being the only practicable means of compelling the carriers to include on the travel documents the particulars the drafters considered essential. (The carrier's address might also have been thought necessary to establish the carrier's domicile for

---

[7] The minutes of the Warsaw Conference are cited here in English translation. For the French original documents, see 2 Conférence Internationale de Droit Privé Aérien, 4–12 Octobre 1929, Varsovie (1930).

jurisdictional purposes under Article 28.) Thus, what the Court considers an "absurd resul[t]," *ante,* at 130, was one precisely intended (at least until the draft reached the Conference floor) by the authors of the Warsaw Convention.

Several conclusions can be drawn from the final draft CITEJA submitted to the Warsaw Conference. First, it is absolutely clear that under this draft the carrier was to lose the benefit of the liability limitation if it delivered a passenger ticket that did not contain the listed particulars. See Horner & Legrez 258 ("If. . . the carrier accepts the traveler without having drawn up a passenger ticket, *or if the ticket does not contain the particulars indicated hereabove . . .*") (emphasis added). What is somewhat less clear is whether the clause stipulating that the transportation was subject to the liability provisions of the Warsaw Convention was among those "particulars." Article 3 referred to "the particulars indicated hereabove"; and while the clause in question was mentioned just above, it was not listed under a letter of the alphabet like the others, but was in a separate paragraph.[8]

---

[8] Article 3, as presented to the conference by CITEJA, read as follows:

"In the carriage of travelers the carrier shall be required to deliver a passenger ticket which shall contain the following particulars:

"(a) the place and date of issue;

"(b) the points of departure and of destination;

"(c) summary indication of the route to be followed (via) as well as the contemplated stopping places;

"(d) the name and address of the carrier or carriers.

"The passenger ticket shall contain, moreover, a clause stipulating that the carriage is subject to the system of liability set forth by the present Convention.

"The absence, irregularity, or loss of this document of carriage shall not prejudice either the existence or the validity of the contract of carriage.

"If, for international carriage, the carrier accepts the traveler without having drawn up a passenger ticket, or if the ticket does not contain the particulars indicated hereabove, the contract of carriage shall nonetheless be subject to the rules of the present Convention, but the carrier shall not have the right to avail himself of the provisions of this Convention which

The parallel provision of Article 4, on the baggage check, was even more ambiguous on this point: while there, too, the liability clause was referred to in a separate paragraph, following particulars lettered (a) through (f), the penalty provision referenced only the failure to issue a ticket that included particulars (a) through (d).[9] The provisions on the air waybill, on the other hand, specified clearly that failure to include the liability statement would result in loss of the liability limit.[10]

---

exclude in all or in part his direct liability or that derived from the faults of his servants." Horner & Legrez 258–259.

[9] Article 4, as presented to the conference, read as follows:

"In the carriage of baggage, other than small personal objects of which the passenger himself retains custody, the carrier shall deliver a baggage check.

.        .        .        .        .

"It shall contain the following particulars:

"(a) the place and date of issue;

"(b) the points of departure and of destination;

"(c) summary indication of the route to be followed (via) as well as the contemplated stopping places;

"(d) the name and address of the carrier or carriers;

"(e) the number of the passenger ticket;

"(f) indication that the check is made out in duplicate;

"(g) indication that the delivery of the baggage to the traveler shall be validly made to the bearer of the check.

"The baggage check shall contain, moreover, a clause stipulating that the carriage is subject to the system of liability set forth by the Convention.

"The absence, irregularity, or loss of this baggage check shall not prejudice either the existence or the validity of the contract of carriage.

"If, for international carriage, the carrier accepts baggage without having made out a ticket, or if the ticket does not contain the particulars indicated hereabove up to and including (d), the contract of the carriage shall nonetheless be subject to the rules of the present Convention, but the carrier shall not have the right to avail himself of the provisions of this Convention, which exclude in all or in part his direct liability or that derived from the faults of his servants." Id., at 259.

[10] Article 8, as presented to the conference, specified 15 particulars the waybill was to contain, of which those lettered (a) through (g) were stated to be compulsory. A separate Article 9 read in full as follows: "The air waybill shall contain a clause stipulating that the carriage is subject to the

At Warsaw, the Japanese delegation, recognizing the just-mentioned ambiguity, proposed an amendment to Articles 3 and 4, which resulted in the reordering of the liability clause as a lettered "particular." The purpose of the change was to make clear that the liability clause was to be treated as obligatory, Horner & Legrez 310, *i. e.*, that its omission would result in loss of the limit on liability. This amendment was apparently regarded merely as a technical question of wording, *id.*, at 272, and it engendered no floor discussion. Had only this amendment been adopted, it would have been clear beyond doubt that failure to include the required statement on the passenger ticket would result in loss of the liability limit. But a second relevant amendment was also adopted, and it produced a much more ambiguous document.

Throughout CITEJA's work on the draft Convention, the Greek delegation had repeatedly objected to the sanctions clause as too harsh. U. S. App. 39a, 51a; 62a–64a, 82a–83a. Its effort at the May 1928 CITEJA meeting to weaken the sanction, by specifying that it should apply only when prejudice was caused by the omission of a particular, was rejected. *Id.*, at 63a–64a, 83a. But at Warsaw, for reasons which do not emerge from the record, a similar Greek amendment, Horner & Legrez 303–304, met with more success. The preparatory committee accepted it to the extent of deleting from Article 3(2) the words, "or if the ticket does not contain the particulars indicated above." *Id.*, at 150.[11] The parallel

---

system of liability set forth by the present Convention." Finally, Article 17 provided: "If, for international carriage the carrier accepts goods without having made out an air waybill, or if the air waybill does not contain all the indications set forth by Article 8 (a) through (g) inclusive, *and by Article 9*, the contract of carriage shall nonetheless be subject to the rules of the present Convention, but the carrier shall not have the right to avail himself of the provisions of this Convention which exclude in all or in part his direct liability or that derived from his servants." *Id.*, at 260–264 (emphasis added).

[11] Since the Greek amendment was classified as one of secondary importance, it was considered in the "preparatory committee," which made no record of its debates, rather than on the floor. Thus, the only clues as to

provision in Article 4 was treated somewhat differently. A change was made in which particulars were deemed obligatory, but three—including the liability statement which became particular *(h)*—remained so; thus, the phrase used in the sanctions clause was "or if the baggage check does not contain the particulars set out at *(d)*, *(f)*, and *(h)* above." *Id.*, at 156. Articles 8 and 9, concerning the air waybill, were rewritten in a similar fashion. *Id.*, at 157–162.

It is not clear what the reason is for the difference between the final structure of Article 3, on one hand, and Articles 4 and 9, on the other. The Solicitor General views it essentially as a drafting error, resulting from a failure to coordinate the Japanese and Greek amendments. Brief for United States as *Amicus Curiae* 18–21. It is, to be sure, possible that the drafters intended to create a different regime for the passenger ticket than for the baggage check and the air waybill. The latter reading draws some support from the Reporter's explanation of the changes made in Article 4 concerning the baggage check: "The last paragraph was not modified like Article 3; that is to say that we have retained the same sanctions in the case of errors in the particulars . . . ." Horner & Legrez 156. But it is puzzling that such a departure from the fundamental principle of applying the same scheme of sanctions to the passenger ticket, the baggage check, and the waybill would have been made without explanation or acknowledgment. As late as the opening substantive session of the Warsaw Conference itself the CITEJA Reporter, Monsieur de Vos, made clear, as he had at the foregoing CITEJA sessions, the principle of parallel treatment of these three documents.[12] Only four days later

---

the reason for the change come from the wording of the Greek proposal and from the comments of the Reporter in presenting the preparatory committee's work to the plenary session.

[12] "In Chapter 2, we examine the matter of transport documents: passenger ticket, baggage check, air waybill for goods. All these documents contain a minimum of particulars.

"The essential thing, in this regard, is the sanction, sanction provided for the three documents, which consists in depriving the carrier who would

Monsieur de Vos himself presented to the convention the preparatory committee's revision of Article 3; and it is difficult to imagine that, had such a fundamental change on this point been intended, he would not have said so explicitly.

An examination of the Greek proposal that led to the change, as well as what Monsieur de Vos said in presenting it, strengthens the impression that no different treatment of the passenger ticket was intended. The Greek proposal referred to the possibility that the carrier might lose its liability limitation because "by simple negligence the carrier has omitted to mention in the passenger ticket the place of issuance, or the point of departure, or his name and address; or even that he keep his former address in the ticket, or finally he does not point out an intermediate stop." Horner & Legrez 303. The Reporter, in presenting the revision of Article 3 to the plenary session, characterized the Greek concern as follows: "[T]he sanction is too severe when it's a question of a simple omission, of the negligence of an employee of the carrier . . . ." *Id.*, at 150. The focus thus appears to have been on clerical errors in filling in the ticket forms. An intent to remove such errors from the list of those that trigger the sanction—as was done also in Article 4 (but not in Article 8)—would not be incompatible with the intent to retain the sanction for failure to include the liability statement, which would hardly result from the same kind of ticket-counter error.

While the record that has been preserved makes it impossible to say with certainty what the treatymakers at Warsaw intended, the explanation that they contemplated only the removal of the four initial particulars from the scope of the sanctions clause finds considerable support in the available evidence. Since at the time the Greek amendment was discussed the liability statement constituted a separate paragraph, rather than being listed as letter *(e)* as it later was, it

carry travelers or goods without documents or with documents not conforming to the Convention, of the benefit of the advantages provided by the Convention." Horner & Legrez 19–20.

is conceivable that the preparatory committee removed the words "or if the ticket does not contain the particulars indicated above," without intending to make the liability statement any less obligatory here than in Articles 4 and 9.

The Court offers several hypotheses as to why the drafters of the Convention might have determined to treat the notice requirement differently for the passenger ticket and the baggage check. *Ante*, at 133–134. Such explanations are, however, difficult to square with the actual history of the Convention's drafting. The final text clearly imposes sanctions for omission of the notice in Article 4, whereas Article 3 is ambiguous on this point; but this was not the case in the draft CITEJA presented to the conference. There, if anything, the sanction applied more clearly to the failure to give notice under Article 3 than under Article 4. *Supra*, at 142–143. If there was any reason, therefore, for according the notice requirement less weight in Article 3 than in Article 4, it must have emerged at the Warsaw Conference itself. But there is no trace of such a purpose in the Warsaw minutes, as there surely would have been had a decision been made to reverse the relative treatment of the Article 3 and 4 sanctions provisions in the previous draft. It seems much more likely, therefore, that the difference between Articles 3 and 4 on this point was an unintended consequence of other changes that were made at the conference.[18]

---

[18] There is an alternative explanation of the difference in language used in the Articles on the passenger ticket, baggage check, and waybill. The term "passenger ticket" can, as already noted, be read to refer to a ticket that contains all of the particulars listed in Article 3(1) (*i. e.*, including the first four, which establish the international character of the transportation). This appears to be the interpretation of Y. Blanc-Dannery, La Convention de Varsovie et les Règles du Transport Aérien International 23–37 (1933). She states flatly: "Article 3 makes no distinction among the particulars: 'the carrier must deliver a passenger ticket which shall contain the following particulars.' Stated differently, all are obligatory." *Id.*, at 28 (translation mine). This is also the conclusion reached by the Quebec Court of Appeal in *Ludecke* v. *Canadian Pacific Airlines, Ltd.*, 53 D. L. R. 3d 636, 638 (1974) ("[T]he carrier must deliver a ticket which sat-

Even if we agree, however, that Article 3 of the Warsaw Convention removes the liability limit for failure to provide notice that the transportation is governed by the Convention's liability provisions,[14] that does not end the matter.

---

isfies the mandatory requirements of art. 3(1) which article is in effect, a definition. If the ticket delivered does not satisfy these requirements it is not a ticket within the meaning of that article and the sanction of art. 3(2) will apply"), appeal dism'd, 98 D. L. R. 3d 52 (Can. 1979). If "passenger ticket" is read in this manner, then it is also possible to understand the last-minute change in the status of the first four particulars listed in Article 4. See n. 9, *supra*. At the same time that these were made nonobligatory on the baggage check, mention of the number of the passenger ticket became an obligatory particular on the baggage check (now Article 4(3)*(d)*). This cross-reference to the passenger ticket may have been seen to make it unnecessary to require that the first four particulars listed there be repeated on the baggage check. This reading harmonizes the treatment of all three transportation documents in regard to these four particulars: they are obligatory in all three cases (this is undisputed in the case of the waybill), although for the baggage check this is accomplished through incorporation by reference of the passenger ticket.

It should be noted, however, that other commentators take a different view. According to D. Goedhuis, National Airlegislations and the Warsaw Convention 152–153 (1937), the Greek amendment established a difference between the sanction provisions of Articles 3 and 4, and the carrier is not bound to include any particulars at all on the passenger ticket. See also G. Miller, Liability in International Air Transport 83, 92 (1977).

[14] In 1955 the Warsaw Convention was amended in a number of respects by the Hague Protocol. Notably, Article 3 was amended to make absolutely clear that the liability limit would not apply if the carrier did not give notice that the Convention's liability limitations governed. See Article III, Protocol to Amend the Convention for the Unification of Certain Rules Relating to International Carriage by Air Signed at Warsaw on 12 October 1929, 478 U. N. T. S. 371, 374–377 (1955). Had the United States ratified the Hague Protocol, its amendments would have been dispositive of the question we have been discussing thus far. It did not do so, however, largely because of dissatisfaction with the Convention's low liability limit, even as doubled by the Hague amendments. See Lowenfeld & Mendelsohn, The United States and the Warsaw Convention, 80 Harv. L. Rev. 497 (1967).

The parties in this case disagree over what the Hague amendment of Article 3 implies about the meaning of the unamended Convention. Compare Brief for Petitioners 37–38 with Brief for Respondent 22–28. Since it is

Respondent Korean Air Lines undeniably did give petitioners such notice. Petitioners' argument goes beyond this, however, and requires us to determine whether there exists a requirement that the notice given be "adequate," and, if so, whether the notice provided in this case met that standard.

Courts in this country have generally read an "adequate notice" requirement into the Warsaw Convention. Thus, notice has been held to be inadequate when it was provided under conditions that did not permit the passenger to act on it (by, for example, purchasing additional insurance). *Mertens* v. *Flying Tiger Line, Inc.*, 341 F. 2d 851, 856–858 (CA2) (ticket delivered after passenger boarded airplane), cert. denied, 382 U. S. 816 (1965); *Warren* v. *Flying Tiger Line, Inc.*, 352 F. 2d 494 (CA9 1965) (ticket delivered at foot of ramp to airplane). Closer to the present situation is the much-noted case of *Lisi* v. *Alitalia-Linee Aeree Italiane, S. p. A.*, 370 F. 2d 508 (CA2 1966), aff'd by equally divided Court, 390 U. S. 455 (1968). There the court characterized the Warsaw Convention notice given by the carrier in 4-point type as "camouflaged in Lilliputian print in a thicket of 'Conditions of Contract'" and as "virtually invisible." 370 F. 2d, at 514. The court therefore held that the ticket had not been "'delivered to the passenger in such a manner as to afford him a reasonable opportunity to take self-protective measures . . . .'" *Id.*, at 513, quoting *Mertens, supra*, at 857. More recently two appellate courts, relying on the Montreal Agreement, have held notice in 8.5-point and 9-point type to be inadequate. *In re Air Crash Disaster at Warsaw, Poland, on March 14, 1980*, 705 F. 2d 85 (CA2), cert. denied *sub nom. Polskie Linie Lotnicze* v. *Robles*, 464 U. S. 845 (1983); *In re Air Crash Disaster Near New Orleans, Louisiana, on July 9, 1982*, 789 F. 2d 1092, 1098 (CA5), rehearing granted,

---

possible to conclude either that the delegates at The Hague thought they were making a substantive change in Article 3(2), or that they merely intended to clarify ambiguous language, the Hague amendments are ultimately of little help in ascertaining the meaning of the original Convention.

795 F. 2d 381 (1986) (en banc), reinstated, 821 F. 2d 1147, 1171 (1987) (en banc).

If notice is indeed required, it must surely meet some minimal standard of "adequacy." All would agree, no doubt, that notice that literally could be read only with a magnifying glass would be no notice at all. *Lisi*, of course, presents a more difficult case. In my view it may well have been correctly decided. But there is a substantial difference between 4-point and 8-point type, particularly where, as here, the notice took the form of the "advice" prescribed by the Montreal Agreement and occupied a separate page in the ticket book. It cannot be said that the notice given here was "camouflaged in Lilliputian print in a thicket of [other conditions]."

The *Warsaw* and *New Orleans* courts did not, of course, find that to be the case where notice was given in 8.5- and 9-point type. Rather, those courts adopted a bright-line rule based on the provision of the Montreal Agreement that requires notice printed in 10-point type. Petitioners here similarly contend that the Montreal Agreement established a bright line which should be taken to define what notice is adequate. I cannot accept this argument. The Montreal Agreement is a private agreement among airline companies, which cannot and does not purport to amend the Warsaw Convention. To be sure, the Agreement was concluded under pressure from the United States Government, which would otherwise have withdrawn from the Warsaw Convention. See Lowenfeld & Mendelsohn, The United States and the Warsaw Convention, 80 Harv. L. Rev. 497, 546–596 (1967). And most air carriers operating in the United States are required by Federal Aviation Administration (FAA) Regulations to become parties to the agreement. See 14 CFR pt. 203, § 213.7 (1988); see also 14 CFR § 221.175(a) (1988) (requiring notice of liability limit in 10-point type). But neither the Montreal Agreement nor the federal regulations purport to sanction failure to provide notice according to the Agreement's specifications with loss of the Warsaw

Convention's limits on liability. The sanction, rather, can be only whatever penalty is available to the FAA against foreign airlines that fail to abide by the applicable regulations, presumably including suspension or revocation of the airline's permit to operate in the United States. See 49 U. S. C. App. § 1372(f).[15]

Nor does the Solicitor General contend in this case that the Montreal Agreement provides for loss of the liability limit in the event of failure to give the specified notice in 10-point type. His argument is, rather, that the Montreal Agreement and the FAA regulation codified at 14 CFR § 221.175(a) (1988) set a clear and reasonable standard which the courts should adopt as a measure of "adequate notice." Brief for United States as *Amicus Curiae* 24–27. Here, however, the notice given was surely "adequate" under any conventional interpretation of that term. That being so, I cannot agree that we have any license to require that the notice meet some higher standard, merely for the sake of a bright line.[16]

---

[15] In *In re Air Crash Disaster at Warsaw, Poland, on March 14, 1980*, 705 F. 2d 85, 90 (CA2), cert. denied *sub nom. Polskie Linie Lotnicze* v. *Robles*, 464 U. S. 845 (1983), the Court of Appeals' analysis to the contrary was based in large part on the fact that "[w]ithdrawal of the Denunciation [by the United States of the Warsaw Convention] and the CAB's acceptance of the Montreal Agreement indicates a judgment by at least the executive branch that 10-point type was necessary to provide sufficient notice . . . ." 705 F. 2d, at 90. While we surely owe considerable deference to the views of the Executive Branch concerning the meaning of an international treaty, *Sumitomo Shoji America, Inc.* v. *Avagliano*, 457 U. S. 176, 184–185 (1982), I do not understand the United States' acceptance of the Montreal Agreement to have been based on its legal opinion on the type size the Warsaw Convention required. Rather, the Government's actions in connection with the Montreal Conference were based on political goals concerning desirable modifications of the existing conditions of international air travel by American passengers. See Lowenfeld & Mendelsohn, 80 Harv. L. Rev., at 546–596. Such circumstances do not call for particular deference to the position taken by the Executive Branch.

[16] Contrary to the Court's belief, *ante*, at 134–135, n. 5, I do *not* assume that an adequate notice requirement exists because courts in this country have generally so held. I take note of those holdings and of the argument advanced by petitioners. I then accept the argument that some minimal

This case is, in my view, far more complex and difficult than the Court would have it.   I am prepared to accept petitioners' position that the Warsaw Convention does sanction failure to provide notice of its applicability with loss of its limit on liability.   Having come that far, I think one must agree as well that notice that is not minimally legible, at the least, is no notice at all.   But I cannot make the leap from there to the view that KAL's 8-point notice was inadequate, as a matter of interpretation of the Warsaw Convention, simply because of the carrier's obligation under a related agreement to provide 10-point notice.   I therefore concur in the Court's judgment that respondent has not lost the benefit of the Convention's limit on liability because of the size of the type used in its notice.

---

level of adequacy is required, but I have no difficulty in determining that the notice given here was adequate.   I express no opinion on the adequacy of notice in 6-point type, because that is not the case before us.