**Onyebuchim ONYEANUSI, Appellant,**

v.

**PAN AM a/k/a Pan American World Airways, Inc.**

**No. 90–1861.**

United States Court of Appeals, Third Circuit.

Submitted Under Third Circuit Rule 12(6) Nov. 18, 1991.

Decided Jan. 2, 1992.

---

John Wendell Beavers, Philadelphia, Pa., for appellant.

Thomas P. Bracaglia, Kelly, McLaughlin & Foster, Philadelphia, Pa., for appellee.

Before MANSMANN, COWEN and ROTH, Circuit Judges.

## OPINION OF THE COURT

COWEN, Circuit Judge.

This appeal involves a claim against Pan Am resulting from Pan Am's alleged mishandling of human remains which it transported from New York to Nigeria. We will affirm the district court's grant of summary judgment in favor of Pan Am.

### I

The unfortunate facts of this case began with the death of Olamma Onyeanusi, a Nigerian of the Ibo tribe, on October 1, 1986 in Philadelphia, while visiting her son, Onyebuchim Onyeanusi.[1] Onyeanusi made arrangements through Videon Funeral Homes[2] of Broomall, Pennsylvania to have Pan Am, an international air carrier, fly his mother's body from New York to Port Harcourt, Nigeria, via Paris. The body was scheduled to leave New York on October 15 and arrive in Nigeria on the morning of October 17. Some 20,000 members of the Ibo tribe began gathering in the Nigerian village of Uzuakoli on October 17 in

---

1. We will hereafter refer to Onyebuchim Onyeanusi as Onyeanusi.

2. Videon was originally a defendant in this case, but was dismissed by the district court in September 1989.

anticipation of the body's arrival and a traditional tribal funeral and burial. The body, however, did not arrive until October 25. At one point during the nine day delay, the airline told Onyeanusi that his mother's remains had arrived in Port Harcourt. When he arrived at the airport, he was presented with the remains of a complete stranger.

When Olamma Onyeanusi's remains finally arrived on October 25, they were damaged and decomposed. The airtray which held the body was broken, allowing the body to be exposed to weather. Authorities at the Paris airport had allowed a French funeral home to repair the casket and rewrap the body. Consequently, when the remains arrived in Nigeria, the body was wrapped in burlap, which according to the Ibo tribe's culture signifies that the decedent committed suicide. The body was also face down in the casket, which according to the tribe's culture signifies that the circumstances of the death were dishonorable. In fact, Olamma Onyeanusi had died of pneumonia.

Onyeanusi filed suit in September 1988 against Pan Am for compensatory and punitive damages. He alleged that the decomposed nature of his mother's body "has been directly associated with the general social and business shunning of plaintiffs and has caused plaintiffs to be blamed for ill-fortunes, natural and otherwise, which befell the tribe and which, in the future, may befall upon the tribe, village and family." Appellant's Brief at 3. The district court granted Pan Am's motion for summary judgment. *See Onyeanusi v. Pan American World Airways, Inc.,* 767 F.Supp. 654 (E.D.Pa.1990) (denying petition for reconsideration of summary judgment grant). Our review of a grant of summary judgment is plenary. *Childers v. Joseph,* 842 F.2d 689, 693 (3d Cir.1988).

## II

At the outset, we must determine whether this case is governed by the Warsaw Convention, which regulates claims against air carriers. Convention for the Unification of Certain Rules Relating to International Transportation by Air, Oct. 12, 1929, 49 Stat. 3000, TS No. 876 (1934), *reprinted in* 49 U.S.C.App. § 1502 note (1988). The Warsaw Convention, to which the United States has been a party since 1934, applies to "international transportation of persons, baggage, or goods performed by aircraft for hire." Art. 1(1). *See also Sulewski v. Fed. Express Corp.,* 933 F.2d 180, 182 (2d Cir.1991) (Warsaw Convention, as a treaty, is equal in force to U.S. domestic law). The Convention sets forth the conditions under which notice must be given to an air carrier in the event of damage to baggage or goods. Damage to baggage must be reported to a carrier within three days of receipt, damage to goods within seven days. Art. 26(2). Delayed delivery of baggage and goods must be reported within fourteen days of receipt. *Id.* All notice must be given in writing. Art. 26(3). The penalty for not complying with these requirements is set forth in Article 26(4): "Failing complaint within the times aforesaid, *no action shall lie against the carrier,* save in the case of fraud on his part." (emphasis added).

In this case, the remains of Onyeanusi's mother arrived in Nigeria on October 25, 1986, but Onyeanusi did not give written notice to Pan Am of the damage to the body and delay in shipping until two months later on December 25, 1986. Therefore, if the Warsaw Convention applies to this case, Onyeanusi's claim is barred. Onyeanusi does not contest the date of his written notification. Rather, he argues that the Convention is not applicable to this case, since his mother's remains do not fall under any of the three categories of "persons, baggage, or goods" set forth in Article 1(1). Pan Am does not contend, nor do we believe, that human remains are "persons" or "baggage." *See Guyton v. Phillips,* 606 F.2d 248, 250 (9th Cir.1979) ("Generally, the term 'person,' as used in a legal context, defines a living human being and excludes a corpse or a human being who has died."), *cert. denied,* 445 U.S. 916, 100 S.Ct. 1276, 63 L.Ed.2d 600 (1980). Thus, the only way that the notice provisions of the Convention would bar

Onyeanusi's claim is if human remains could be considered "goods."

The Court of the Appeals for the Ninth Circuit addressed this exact issue in *Johnson v. American Airlines, Inc.*, 834 F.2d 721 (9th Cir.1987). In *Johnson*, remains transported from California to Ireland arrived in Ireland in a damaged condition and with personal property missing from the casket. The Ninth Circuit held that human remains must be treated as "goods" for the purpose of the Convention. *Id.* at 723. *Cf. Blair v. Delta Air Lines Inc.*, 344 F.Supp. 360, 365 (S.D.Fla.1972), *aff'd*, 477 F.2d 564 (5th Cir.1973) (per curiam); *Milhizer v. Riddle Airlines, Inc.*, 185 F.Supp. 110, 114 (E.D.Mich.1960), *aff'd*, 289 F.2d 933 (6th Cir.1961) (both finding human remains to be like other freight in domestic flights). We believe *Johnson* is a correct reading of the Warsaw Convention.

The only other case decided by an American court which has addressed this issue is *Tarar v. Pakistan Int'l Airlines*, 554 F.Supp. 471 (S.D.Tex.1982). In *Tarar*, the body of a deceased Pakistani was transported by Pakistan International Airlines (PIA) from Houston to Pakistan. Because of a series of mishaps, the body arrived in Pakistan four days after the scheduled burial. The decedent's family, who were devout Moslems, sued the airline for emotional damages resulting from the delay, since the Islamic faith dictates that family members must be buried promptly. The court held that human remains are not "persons, baggage, or goods" for the purposes of the Warsaw Convention since human remains are not commercial goods.[3] *Id.* at 478. Having concluded that human remains are not "persons, baggage, or goods," thus making the Warsaw Convention inapplicable, the court nevertheless proceeded to analyze whether PIA's alleged misconduct made the Convention's liability limitations inapplicable. *Id.* at 478–79. Given the seemingly contradictory conclusions of *Tarar*, we find it to be of limited precedential

value. *See Johnson*, 834 F.2d at 723 n. 2 (the conclusion of *Tarar* that human remains are not "goods" is dictum).

Onyeanusi contends that *Johnson*, on which the district court relied, is at odds with the French interpretation of the Warsaw Convention. Because the official version of the treaty is in French—the version contained in the United States Code is merely an unofficial translation—we look for guidance to the French definition of "goods." *See Air France v. Saks*, 470 U.S. 392, 399, 105 S.Ct. 1338, 1342, 84 L.Ed.2d 289 (1985) (looking to French legal meaning in interpreting the Convention's use of the term "accident"); *In re Korean Air Lines Disaster of Sept. 1, 1983*, 932 F.2d 1475, 1485–87 (D.C.Cir.1991) (analyzing French concept of punitive damages for purpose of interpreting Convention), *cert. denied sub nom. Dooley (Philomena) v. Korean Air Lines, Ltd.*, —— U.S. ——, 112 S.Ct. 616, 116 L.Ed.2d 638 (1991). "Goods" is a translation of the French word "marchandises" which has been interpreted as "anything able to be the object of a commercial transaction." Lawrence B. Goldhirsch, *The Warsaw Convention Annotated: A Legal Handbook* 8 (1988). Onyeanusi contends that human remains do not fit under this definition, since human remains "belong to no one, cannot be bought or sold, and have a type of value, however it can be described, which is not comfortably comprehended in its damage recovery provisions." Appellant's Brief at 9. We disagree.

We recognize that one French case has held that human cadavers are not covered by the Convention. *Djedraoui c. Tamisier*, 1953 RFDA 494 (Trib.Paix Paris, 31 March 1952). Although French interpretations of the Convention's terms are entitled to some deference, we are not limited to looking at French interpretations. In *Air France*, the Supreme Court went beyond French cases to the judicial opinions of other signatories of the Convention, includ-

---

**3.** The *Tarar* court's conclusion was based in part on PIA's concession that it "[did] not consider human remains to be ordinary commercial goods, but rather to be accorded special treatment and care by PIA." *Tarar*, 554 F.Supp. at 478. In this case, the district court found no evidence that Pan Am considered human remains to be any different from other types of cargo. *Onyeanusi*, 767 F.Supp. at 656–57.

ing the United States. 470 U.S. at 403–05, 105 S.Ct. at 1344–45. In this case, we are confronted with an apparent conflict between a French and an American case. We believe the Ninth Circuit's interpretation in *Johnson* is more sound. However, because neither *Johnson* nor *Tarar* provide much explanation for their conclusions, the precise nature of human remains needs to be examined in greater detail.

Human remains can have significant commercial value, although they are not typically bought and sold like other goods. Medical schools and hospitals commonly use human cadavers for training and experiments. Human tissue and organs which are taken from the recently deceased have inestimable value in transplant operations. Although remains which are used for these medical and scientific purposes are usually donated, rather than bought and sold, this does not negate their potential commercial value. Onyeanusi argues that many states prohibit commerce in human remains or organs. Notwithstanding the legality of selling some parts of the human body, most notably blood and sperm, we believe these state laws against organ and tissue sales [4] are premised on moral and ethical,[5] rather than economic, considerations. In fact, the very existence of these state laws indicates that there would be a market for human

remains in the absence of government intervention.[6]

■ Furthermore, Onyeanusi's narrow reading of the term "goods" would frustrate the broad purposes of the Warsaw Convention. At the time of the Convention's signing in 1929, the airline industry was still in its infancy. The negotiators who met in Warsaw feared that the fledgling industry would never develop and prosper if it could be liable for catastrophic judgments. *See* Andreas F. Lowenfeld and Allan I. Mendelsohn, *The United States and the Warsaw Convention*, 80 Harv. L.Rev. 497, 498–99 (1967) (describing history of Warsaw Convention). Thus, the two goals of the Convention were to create uniformity in the filing of claims and, more importantly, to limit the potential liability of air carriers. *Floyd v. Eastern Airlines, Inc.*, 872 F.2d 1462, 1467 (11th Cir.1989), *rev'd on other grounds*, —— U.S. ——, 111 S.Ct. 1489, 113 L.Ed.2d 569 (1991). Although the airline industry has "taken off" to a degree never envisioned by the Wright Brothers, much less the Convention's signatories in 1929, courts must remain faithful to the Convention's original purposes, with consideration given to subsequent amendments.

**4.** *See, e.g.,* Ark.Code Ann. § 20–17–802(c) (Michie 1987); Cal.Penal Code § 367f (West 1988); Fla.Stat.Ann. § 873.01 (West Supp.1991); Ga. Code Ann. § 16–12–160 (Michie 1991); La.Rev. Stat.Ann. § 14:101.1 (West Supp.1991); Md. Health–Gen.Code Ann. § 5–408 (1988); Mich. Comp.Laws Ann. § 333.10204 (West Supp.1991); Minn.Stat.Ann. § 145.422 subd. 3 (West 1989); Nev.Rev.Stat.Ann. § 201.460 (Michie 1989); N.Y.Pub.Health Law § 4307 (McKinney 1985); 35 Pa.Stat.Ann. § 10025 (Supp.1991); Tex.Penal Code Ann. § 48.02 .(West 1989); W.Va.Code § 16–19–7a (1991); Wis.Stat.Ann. § 146.345 (West 1989). In some states, the buying and selling of organs is allowed in limited circumstances. *See, e.g.,* Ga.Code Ann. § 16–12–160(b)(5) (exception for "health sciences education"); Md.Health–Gen.Code Ann. § 5–408(a)(2) (exception for nonprofit organizations under § 501(c)(3) of the Internal Revenue Code).

**5.** Several of the state laws against organ and tissue sales are contained in chapters or sections dealing with morality. *See, e.g.,* California ("of

crimes against the person involving sexual assault, and crimes against public decency and good morals"); Georgia ("offenses against public health and morals"); Louisiana ("offenses affecting the public sensibility"); Nevada ("crimes against public decency and good morals"); Texas ("offenses against public health, safety, morals"), *supra* note 4.

**6.** Regrettably, a market in human organs seems to be flourishing in many Third World countries. *See* Chris Hedges, *Egypt's Desperate Trade: Body Parts for Sale*, N.Y. Times, Sept. 23, 1991, at A1; *Brazil: The Organ Trade*, Int'l Press Service, March 27, 1991, *available in* LEXIS, Nexis Library; *cf. Body Organ Sales Discussed as Way to Increase Supply*, L.A. Times, Sept. 24, 1991, at A4 (proposal to solve organ shortage in U.S. by allowing organ sales). For a theoretical analysis of the "market" in the adoption context, see Richard A. Posner, *The Regulation of the Market in Adoptions*, 67 B.U.L.Rev. 59 (1987); Elisabeth Landes and Richard A. Posner, *The Economics of the Baby Shortage*, 7 J. Legal Stud. 323 (1978).

■ In order to further the goals of uniformity and liability limitation, the Convention's provisions must be construed broadly. *Floyd*, 872 F.2d at 1473. Indeed, the purposes of the Convention must be furthered "to the greatest extent possible, even if that entails rejecting a literal reading" of the Convention. *Benjamins v. British European Airways*, 572 F.2d 913, 918 (2d Cir.1978), *cert. denied*, 439 U.S. 1114, 99 S.Ct. 1016, 59 L.Ed.2d 72 (1979). *See also Air France*, 470 U.S. at 396, 105 S.Ct. at 1341 (to determine the meaning of a treaty, "we may look beyond the written words to the history of the treaty, the negotiations, and the practical construction adopted by the parties.") (quoting *Choctaw Nation of Indians v. United States*, 318 U.S. 423, 432, 63 S.Ct. 672, 678, 87 L.Ed. 877 (1943)). Consequently, the Convention has been found to apply to a wide variety of "goods" whose commercial values are difficult to ascertain. *See Dalton v. Delta Airlines, Inc.*, 570 F.2d 1244 (5th Cir.1978) (greyhound racing dogs); *Jahanger v. Purolator Sky Courier*, 615 F.Supp. 29 (E.D.Pa.1985) (legal documents); *Hughes–Gibb & Co., Ltd. v. Flying Tiger Line, Inc.*, 504 F.Supp. 1239 (N.D.Ill.1981) (breeding swine). To exclude human remains from the definition of "goods" would exempt a significant number of claims from the Convention, thus exposing air carriers to inestimable liability. To excuse claimants such as Onyeanusi from the notice requirements would undermine uniformity in the processing of claims.

■ When the Warsaw Convention applies, it is the exclusive remedy for actions against air carriers. *Abramson v. Japan Airlines Co.*, 739 F.2d 130, 134 (3d Cir. 1984), *cert. denied*, 470 U.S. 1059, 105 S.Ct.

1776, 84 L.Ed.2d 835 (1985).[7] Given our determination that the Warsaw Convention's use of the term "goods" includes human remains, Onyeanusi was required to give written notice to Pan Am within seven days of receiving his mother's body in the event of damage and fourteen days in the event of delay. The notification requirements of the Convention were extended in Pan Am's air waybill, which allows written notice within fourteen days for damage and twenty-one days for delay.[8] App. at 84, ¶ 12(a). In waiting two months to give such notice, Onyeanusi did not comply with either of these requirements, and thus his claim is barred.

### III

To avoid the notification requirements of the Warsaw conventions, Onyeanusi argues that: 1) Pan Am's intentional and willful misconduct makes the Convention inapplicable; 2) the irregularities in the air waybill remove the Convention's limits on liability; and 3) Pan Am had constructive notice of Onyeanusi's claim regardless of whether it received formal written notice within the required periods. We find each of these arguments to be without merit.

Onyeanusi alleges that Pan Am engaged in intentional and willful misconduct by giving him false information and assurances during the nine days when his mother's body was missing and by producing the wrong body at one point. Article 25(1) states that "[t]he carrier shall not be entitled to avail himself of the provisions of this convention which *exclude or limit his liability*, if the damage is caused by his wilful misconduct ..." (emphasis added). After a thorough examination of the record, we conclude that the district court

---

**7.** Whether the Warsaw Convention provides an exclusive cause of action which precludes state causes of action is not a settled issue. *See In re Korean Air Lines Disaster of Sept. 1, 1983*, 932 F.2d at 1491–92 (D.C.1991) (Mikva, C.J., dissenting in part) (discussing split in circuits). Because the Supreme Court has declined to resolve this issue in two recent cases, *see Eastern Airlines, Inc. v. Floyd*, —— U.S. ——, 111 S.Ct. 1489, 1502, 113 L.Ed.2d 569 (1991); *Air France*, 470 U.S. at 408, 105 S.Ct. at 1346, we will continue to adhere to our decision in *Abramson*.

**8.** At the time the body was shipped to Nigeria, Onyeanusi should have known that any claim would be covered by the Warsaw Convention, since Pan Am's air waybill identified his mother's remains as "goods." App. at 23. The air waybill also warned that any recovery for damage or delay would be limited by the Warsaw Convention, unless the shipper opted to pay a higher shipping fee. App. at 84.

did not err in finding that there was insufficient evidence of Pan Am's willful misconduct.[9]

■ Assuming arguendo that Onyeanusi's allegations were true, Article 25(1) would only excuse the Convention's limitations on monetary liability, not the requirements of notice. *See Highlands Ins. v. Trinidad & Tobago (BWIA Int'l)*, 739 F.2d 536, 539 (11th Cir.1984) ("[A]rticle 25 does not deprive the carrier of the article 26 notice protections."); *Butler's Shoe Corp. v. Pan American World Airways, Inc.*, 514 F.2d 1283, 1285 (5th Cir.1975) (notice provisions not a limitation or exclusion of liability); *cf. Stone v. Mexicana Airlines, Inc.*, 610 F.2d 699, 700 (10th Cir.1979) (carrier's willful misconduct did not affect Convention's statute of limitations period). Thus, even if Pan Am's misconduct were found to be willful, Onyeanusi still would have been required by the Convention to notify Pan Am within seven days of any damage to his mother's remains.

■ Onyeanusi next argues that Pan Am's air waybill omitted crucial information required by Article 8 of the Convention. Specifically, Onyeanusi claims that the waybill did not specify the agreed stopping places of the body (Article 8(c)), lacked the required numerical markings (Article 8(h)), and failed to describe the method in which the body was packed (Article 8(h)). Under Article 9, the absence of such information precludes the carrier from "avail[ing] himself of the provisions of this convention which *exclude or limit his liability.*" (emphasis added). We conclude that the air waybill provided sufficient information. The waybill stated that the agreed stopping place was "CDG," which is the abbreviation for Charles De Gaulle Airport in Paris. The plane carrying the body did, in fact, stop in Paris. The waybill also specified that the shipment contained the "human remains of the late Olamma Onyeanusi." App. at 23. Although the waybill did not describe the method in which the body was packed, this was a "technical and insubstantial omission[ ]" which does not affect the Convention's limitation of liability. *Exim Industries, Inc. v. Pan American World Airways, Inc.*, 754 F.2d 106, 108 (2d Cir.1985). *Cf. Chan v. Korean Air Lines, Ltd.*, 490 U.S. 122, 126, 109 S.Ct. 1676, 1679, 104 L.Ed.2d 113 (1989) (airline's failure to provide notice of per passenger damages limitation did not preclude application of Convention). The body of Onyeanusi's mother was packed in an airtray used for shipping human remains and clearly marked as containing a corpse. Anyone handling the shipment would have been aware of its contents and the appropriate method of handling it. Even if the waybill lacked the necessary information, Article 9, like Article 25(1), only excuses the monetary liability limitations, not the notification requirements.

■ As for Pan Am's actual or constructive notice, Pan Am very well might have known of damage to the corpse when it was delivered to Onyeanusi. Indeed, there is some evidence that Pan Am agents knew the body was missing and might suffer damage and decomposition as a result of the delay.[10] Nevertheless, the Warsaw Convention clearly requires written notice. As the Ninth Circuit explained in *Stud v. Trans Int'l Airlines*, 727 F.2d 880 (9th Cir.1984):

> Article 26(3) requires that the notice of complaint be in writing. If written notice of a consignee's complaint is necessary to preserve the right of recovery, a carrier's actual knowledge of the loss, gleaned from a source other than a written notice of complaint, is necessarily insufficient. One reason for the written notice requirement is to avoid endless speculation about who knew what and when they allegedly knew it.

---

9. Judge Mansmann would find that the plaintiff's allegations of Pan Am's mishandling of the body rise to the level of reckless disregard sufficient to state a triable issue of willful misconduct under Article 25(1), but that the plaintiff's failure to give timely notice precludes his claim.

10. It is worth noting that Pan Am's air waybill precludes the representations of its agents from waiving the notification requirements: "no agent, servant or representative of Carrier has authority to alter, modify or waive any provisions of this contract." App. at 84, ¶ 14.

*Id.* at 883 (citations omitted). The clear dictates of Article 26(3) require written notice even if an agent of the air carrier has made some affirmative representation that she is aware of the damage or delay. *See Denby v. Seaboard World Airlines, Inc.,* 575 F.Supp. 1134, 1144 (E.D.N.Y.1983) ("Formal written notice provides ... an express and definite statement of the shipper's intention to hold the carrier liable. Actual notice gives the carrier nothing to indicate that he, rather than another party, is the object of the shipper's claim."), *rev'd on other grounds,* 737 F.2d 172 (2d Cir. 1984). This notice requirement is only waived when goods are destroyed, since "[i]n the case of destruction or loss of baggage or cargo, theoretically the carrier is already aware of the damage and therefore needs no notice." Goldhirsch, *supra,* at 130. In this case, Onyeanusi made no claim that his mother's remains were destroyed or lost completely, therefore he was not excused from the written notice requirements.

### IV

Although we are not unsympathetic to Onyeanusi's plight, we agree with the Ninth Circuit's decision in *Johnson v. American Airlines, Inc.,* which we believe is entirely consistent with the purposes of the Warsaw Convention. Because Onyeanusi failed to give Pan Am written notice within the required period of time, his claim is barred. Accordingly, we will affirm the district court's order granting summary judgment in favor of Pan Am.