

2008 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

2-27-2008

# Warner Lambert v. LEP Profit Intl

Precedential or Non-Precedential: Precedential

Docket No. 06-3244

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2008

Recommended Citation

"Warner Lambert v. LEP Profit Intl" (2008). *2008 Decisions.* Paper 1488.
http://digitalcommons.law.villanova.edu/thirdcircuit_2008/1488

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova University School of Law Digital Repository. It has been accepted for inclusion in 2008 Decisions by an authorized administrator of Villanova University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

_____

Nos. 06-3244, 06-3340, 06-3341
_____


WARNER LAMBERT COMPANY

v.

LEP PROFIT INTERNATIONAL, INC.;
LEP INTERNATIONAL (JAPAN) LTD,;
FEDERAL EXPRESS CORPORATION;
BOEING COMPANY;
JOHN DOES 1 THROUGH 5

LEP Profit International, Inc.,

                    Appellant No. 06-3244


_____


*(continued)*

_____

WARNER LAMBERT COMPANY,

Appellant No. 06-3340

vs.

LEP PROFIT INTERNATIONAL, INC.;
LEP INTERNATIONAL (JAPAN) LTD,;
FEDERAL EXPRESS CORPORATION;
BOEING COMPANY;
JOHN DOES 1 THROUGH 5

_____

WARNER LAMBERT COMPANY

v.

LEP PROFIT INTERNATIONAL, INC.;
LEP INTERNATIONAL (JAPAN) LTD,;
FEDERAL EXPRESS CORPORATION;
BOEING COMPANY;
JOHN DOES 1 THROUGH 5

LEP International (Japan) Ltd.,
Appellant No. 06-3341

_____

2

_____

On Appeal from the United States District Court
for the District of New Jersey
(D.C. Civil Nos. 99-cv-03618; 99-cv-03619; 00-cv-00228)
District Judge: Honorable  Katharine S. Hayden

_____

Argued September 12, 2007

Before:  RENDELL, FUENTES, and CHAGARES,
Circuit Judges

Filed: February 27, 2008

_____

James F. Campise
Cozen & O'Connor
45 Broadway, Atrium, Suite 1600
New York, NY 10006-0000

Andrew R. Spector     **[ARGUED]**
Hyman Spector & Mars
150 West Flagler Street, Suite 2701
Miami, FL 33130-0000
*Counsel for Appellant*
*LEP Profit International, Inc.*

*(continued)*

3

Robert C. von Ohlen Jr.
Kaplan, von Ohlen & Massamillo
120 North LaSalle Street, 24th Floor
Chicago, IL 60602-0000
*Counsel for Appellee*
*Federal Express Corporation*

James A. Saville Jr.
Hill, Rivkins & Hayden
175 North Broadway
South Amboy, NJ 08879-1638

Keith B. Dalen      **[ARGUED]**
Hill, Rivkins & Hayden
45 Broadway, Suite 1500
New York, NY 10006-0000
*Counsel for Appellant*
*LEP International (Japan) Ltd.*

Robert G. Rose      **[ARGUED]**
Day Pitney
P.O. Box 1945
Morristown, NJ 07962-0000

John P. Scordo      **[ARGUED]**
Day Pitney
200 Campus Drive
Florham Park, NJ 07932
*Counsel for Appellee*
*Warner Lambert Company*

4

_____

OPINION OF THE COURT

_____


RENDELL, <u>Circuit Judge</u>.

Warner-Lambert Company ("Warner-Lambert") appeals
from the District Court's entry of final judgment limiting the
liability of Federal Express Corporation ("FedEx"), LEP Profit
International Inc. ("LEP Profit"), and LEP International (Japan),
Ltd. ("LEP Japan") to $9.07 per pound, pursuant to Article 22(2)
of the Warsaw Convention, for pharmaceutical cargo destroyed
when a FedEx plane crashed on July 31, 1997, while attempting
to land at Newark International Airport.  The shipment had left
Japan on July 30, 1997, destined, ultimately, for Puerto Rico.
LEP Profit and LEP Japan individually performed various
functions in connection with the transport of the troglitazone
shipment at issue, such as arranging and coordinating
transportation, engaging outside contractors (including FedEx),
and preparing necessary documentation and air waybills.  The
District Court held that LEP Profit and LEP Japan acted as
"indirect carriers" with respect to the shipment at issue,
subjecting them to common carrier liability under the Warsaw
Convention, as opposed to liability as "freight forwarders."
Warner-Lambert, LEP Profit, and LEP Japan filed appeals.  For

5

the reasons stated below, we will affirm the District Court's classification of LEP Profit and LEP Japan as indirect carriers, but reverse the District Court's entry of final judgment limiting the liability of FedEx, LEP Profit, and LEP Japan, and remand for further proceedings consistent with this opinion.

## DISCUSSION

This Court exercises plenary review over a grant of summary judgment, *Onyeanusi v. Pan Am. World Airways, Inc.*, 952 F.2d 788, 790 (3d Cir. 1992), and reviews *de novo* pure questions of law and the application of law to uncontested facts, *Ilchuk v. Att'y Gen. of U.S.*, 434 F.3d 618, 621 (3d Cir. 2006).

This case is fact-intensive and the relevant facts were well catalogued by the District Court. We repeat them herein below as necessary to our discussion. Our resolution of the issues was aided not only by a review of the record, briefs, and case law, but also by oral argument.

## I. Classification of LEP Profit and LEP Japan

The characterization of LEP Profit and LEP Japan as either "indirect carriers" or "freight forwarders" turns on the specific involvement of each in the arrangement and oversight of the troglitazone shipment at issue. It presents a close question in the instant factual setting. There is no dispute as to

6

the parties' respective roles in the shipment and the terms of the documents that they drafted, filled in, or were governed by. The challenge lies in fitting what they did neatly within the category of "indirect carrier" or "freight forwarder" under the four-factor analysis that is customarily used. *See Zima Corp. v. M.V. Roman Pazinski*, 493 F. Supp. 268, 273 (S.D.N.Y. 1980).

Both LEP Profit and LEP Japan urged that they were freight forwarders in connection with this shipment.[1] The District Court examined the functions performed by each and, after a thorough and well-reasoned analysis, concluded that they had instead acted as indirect carriers. We have reviewed the relevant case law distinguishing between freight forwarders and indirect carriers, and agree with this conclusion. Accordingly we will affirm this aspect of the District Court's order.

## II.    Limitation of Liability

The extent of FedEx's liability (and consequently of LEP Profit and LEP Japan) depends entirely on how we read Article 8(c) of the Warsaw Convention, which—together with Article 9—excepts from the limitation of liability carriers who

---

[1]Usually, entities in the position of LEP Profit and LEP Japan urge or concede that they are carriers so as to be covered by the protections of the Warsaw Convention. It is rare that the position is taken, as it is here, that they are, instead, freight forwarders.

fail to list "agreed stopping places" on the air waybill. Here, the relevant transportation of goods was from Japan to Puerto Rico, with stops in Anchorage, Alaska, and Newark, New Jersey. The FedEx flight from Anchorage crashed while landing on the Newark runway, and the entire shipment of pharmaceuticals was destroyed. None of the air waybills prepared in connection with the shipment listed Anchorage, nor did they indicate that once Flight 78 (the FedEx flight from Tokyo to Anchorage) terminated in Anchorage, the cargo would be transferred onto Flight 14, which in turn would terminate at Newark Airport, where the cargo was to be transferred by truck to JFK. Warner-Lambert seized upon this omission as its basis for imposing liability on FedEx, LEP Profit, and LEP Japan for the full value of the goods rather than the $9.07 per pound limitation under the Warsaw Convention.

Our ruling in this regard has limited significance because the Hague Protocol, which became effective in 1999, changed the relevant provision so as to require listing of only those stopping places that give international character to an otherwise domestic or single-country flight.[2] Nevertheless, it is of obvious

---

[2]Article 8(b) of the Convention, as amended by the Hague Protocol, requires that the air waybill contain, "if the places of departure and destination are within the territory of a single High Contracting Party, one or more agreed stopping places being within the territory of another State, an indication of at
(continued...)

significance to the parties involved in this mishap, which occurred in 1997, and parties to any other cases currently in litigation involving pre-1999 incidents subject to the Warsaw Convention.[3]

The District Court concluded that the "agreed stopping places" requirement should be read as limited only to flights that had both their place of origin and destination within the territory of a single High Contracting Party, but had an interim stop outside the territory of the Party (e.g., a flight from Los Angeles to New York, with an interim stop in Toronto). The District Court reasoned that "the driving force of 8(c) as a whole is to ensure notice and acknowledgment, not as to every stop, but as to stops [that] pertain to and indicate the international character of the shipment of the flight." Dist. Ct. Op. at 22. "Consequently," the District Court continued, "8(c)'s requirement to list 'agreed stopping places' is inextricably

---

[2](...continued)
least one such stopping place." Protocol to Amend the Convention for the Unification of Certain Rules Relating to International Carriage by Air signed at Warsaw on 12 October 1929, Sept. 28, 1955, 478 U.N.T.S. 371 ("Hague Protocol").

[3]We agree with the District Court that the Hague Protocol should not be given retroactive effect. *See Arkwright Mut. Ins. Co. v. LEP Profit Int'l, Inc.*, No. 99-3618, slip op. at 17 (E.D. Pa. Aug. 16, 2001) ("Dist. Ct. Op.") (citing *Fujitsu Ltd. v. Federal Express Corp.*, 247 F.3d 423, 431-34 (2d Cir. 2001)).

related to making sure the parties are aware of the international character of the flight, and not a very general (and overly burdensome) notice requirement that requires every stop to be listed." Dist. Ct. Op. at 22-23. It reasoned that, here, because the origin of the shipment and the destination were in different countries, no stopping places needed to be listed, and the exception to limited liability did not apply. Thus, the District Court granted FedEx's motion for partial summary judgment and held that FedEx was entitled to limited liability under the Convention.

We respectfully disagree with the District Court's conclusion that the strictures of Article 8(c) are satisfied as long as the air waybill gives the shipper notice of the international nature of the shipment. Based on the Convention's plain text, the drafting history of Article 8, and its overall structure, we do not find its application to be so limited. Rather, we find the jurisprudence of the Court of Appeals for the Second Circuit, which requires the listing of all stopping places contemplated by the carrier and which represents the "prevailing view" in this area, *see Fireman's Fund Ins. Co. v. Panalpina, Inc.*, No. 00 C 2595, 2001 WL 969032, at *2 (N.D. Ill. Aug. 24, 2001), to be both persuasive and on point.[4] The meaning the District Court

_____

[4]*See, e.g., Tai Ping Ins. Co. v. Northwest Airlines, Inc.*, 94 F.3d 29, 33 (2d Cir. 1996) ("Concededly, the air waybill . . . reveals the international character of the flight and the
(continued...)

10

[4](...continued)

applicability of the Warsaw Convention. Nevertheless, if the air waybill does not incorporate the agreed stopping places effectively, the air waybill does not contain the information required."); *Intercargo Ins. Co. v. China Airlines, Ltd.*, 208 F.3d 64, 69-70 (2d Cir. 2000) (finding that Article 8(c) had not been satisfied as carrier failed to properly incorporate Taipei as an "agreed stopping place" even though point of departure (Los Angeles) and destination (Hong Kong) clearly noticed international nature of shipment); *Fed. Ins. Co. v. Yusen Air & Sea Servs. Pte. Ltd.*, 232 F.3d 312, 314-15 (2d Cir. 2000) (same, with departure (Singapore), destination (Massachusetts), and stopping place (Amsterdam)); *see also Sotheby's v. Fed. Express Corp.*, 97 F. Supp. 2d 491, 498 (S.D.N.Y. 2000) (rejecting argument that "agreed stopping places" refers to literal agreement between shipper and carrier before waybill is issued, and holding that Article 8(c) "requires the carrier to include on the air waybill all stopping places contemplated by the carrier"); *Mitsui Marine & Fire Ins. Co. v. China Airlines, Ltd.*, 101 F. Supp. 2d 216, 221 (S.D.N.Y. 2000) (same).

We note FedEx's contention that the terms and conditions of its Service Guide— which include the statement: "There are no stopping places which are agreed at the time of tender of the shipment, and we reserve the right to route the shipment in any way we deem appropriate"—specifically disclaimed the need to list stopping places. FedEx cites the Ninth Circuit's decision in *Insurance Co. of North America v. Federal Express Corp.*, 189 F.3d 914 (9th Cir. 1999), in support

(continued...)

11

gave to the language of 8(c) requires an additional caveat that simply does not appear in the text.  Moreover, the later change effectuated by the Hague Protocol could just as easily be viewed as changing and restricting, rather than clarifying, the exceptions for limited liability.  In addition, the drafting history of the Convention reveals another animating purpose for the need to list "agreed stopping places," namely the desire of shippers to know precisely where their goods would be landing so as to anticipate the applicability of other laws, potential risks, customs regulations, and the like.[5]

_____

[4](...continued)
of this contention.  In *Insurance Co. of North America*, however, the FedEx air waybill expressly incorporated the Service Guide into the waybill's "Conditions of Contract."  There was no such incorporation here, and thus, *Insurance Co. of North America* is distinguishable on its facts.  We therefore express no opinion as to what effect, if any, a proper incorporation would have had on this case.

[5]The minutes of the 1929 Convention recount a dialogue between the delegate from Switzerland and the Convention's official reporter in which the Swiss delegate urged that Article 8(c) require an indication of the "route to be followed," expressing concerns about possible seizure of goods, levying of fines, and varying customs regulations.  *See* Minutes, Second International Conference on Private Aeronautical Law, Oct. 4-12, 1929, Warsaw, 158-59 (R. Horner & D. Legrez trans. 1975).
(continued...)

12

Finally, we find that the mere listing of Flight 78 (as "FX078/30" and "FX78/30") on the air waybills at issue was not sufficient to satisfy the requirements of Article 8(c), as the record indicates that the information relayed was not complete.[6] Thus, having failed to satisfy the requirement that Anchorage be listed as an "agreed stopping place," we conclude, pursuant to Article 9, that no carrier involved in this case—whether direct or indirect—may avail itself of the limited liability provisions of

[5](...continued)
The official reporter objected to this suggestion, stating that "[a]ll the guarantees which we need can be found in the words 'the contemplated stopping places.' Provided there is no stop in any country overflown, there is nothing to be feared from the authorities of this country." *Id.* at 159. Accordingly, the indication of the "route to be followed" was thereafter deleted from Article 8(c), *id.* at 161, and the language was included in Article 8(p) as an optional particular.

[6]*See Intercargo*, 208 F.3d at 70 (rejecting same argument as proffered by Appellees here and stating that "when a carrier seeks to comply with Article 8(c) without listing stopping places but instead incorporates by reference its scheduled timetables, the flight information included on the waybill must be both accurate and complete."); *id.* at 69 ("[C]arrier must include on the waybill accurate and complete information as to transfer flight numbers and dates" in order to incorporate timetables by reference); *see also Yusen*, 232 F.3d at 314-15 (relying on *Intercargo* in rejecting same argument as proffered by Appellees here).

13

the Warsaw Convention.[7]  Accordingly, we will reverse the District Court's grant of summary judgment in favor of FedEx.

## CONCLUSION

For the reasons set forth above, we will AFFIRM the District Court's classification of LEP Profit and LEP Japan as indirect carriers; REVERSE the District Court's June 13, 2006 Amended Order of Final Judgment, which limited the liability of Fed Ex, LEP Profit, and LEP Japan pursuant to Article 22 of the Warsaw Convention; and REMAND for further proceedings consistent with this Opinion.

---

[7]We reach this conclusion notwithstanding the parties' arguments that various provisions of their contracts and waybills limit their liability.  Pursuant to Article 23 of the Convention, "[a]ny provision tending to relieve the carrier of liability or to fix a lower limit than that which is laid down in th[e] Convention shall be null and void." Warsaw Convention art. 23.

FUENTES, concurring in part and dissenting in part.

I join the majority in its affirmance of the District Court's finding that, in connection with this transaction, LEP Profit and LEP Japan acted as "indirect carriers" and not as "freight forwarders." However, I respectfully dissent from the majority's conclusion that the District Court's finding that FedEx was entitled to benefit from the limited liability provision of the Warsaw Convention was in error. The majority reversed the District Court's decision on that issue because FedEx failed to specifically list Anchorage, Alaska and Newark, New Jersey as "agreed stopping places" on the air way bill for the relevant transaction.

As noted above, to be eligible for limited liability protection, Article 9 of the Warsaw Convention requires that a

15

carrier comply with the Convention's requirements for documenting a given shipment in an "air waybill." A proper "air waybill" must contain certain particulars listed in Article 8 of the Warsaw Convention, including the following, which is the text of subpart (c) and the disputed provision in this case:

> The agreed stopping places, provided that the carrier may reserve the right to alter the stopping places in cases of necessity, and that if he exercises that right, the alteration shall not have the effect of depriving the transportation of its international character.

The majority here adopts an interpretation of 8(c) articulated in a line of cases from the Second Circuit. These cases found that all interim stops are encompassed by the phrase "agreed stopping places," so that failure to specifically list any such stop on the waybill of an international flight renders the

16

carrier ineligible for limited liability protection. <u>See</u>, <u>e.g.</u>, <u>Intercargo Ins. Co. v. China Airlines, Ltd.</u>, 208 F.3d 64, 69-70 (2d Cir. 2000); <u>Tai Ping Ins. Co. v. Northwest Airlines, Inc.</u>, 94 F.3d 29, 31 (2d Cir. 1996). The rationale for interpreting 8(c) in such a stringent fashion is that limited liability affords carriers a "significant benefit"; as such, "omission of any required item from the air waybill will result in the loss of limited liability regardless of the commercial significance of the omission." <u>Fujitsu Ltd. v. Federal Exp. Corp.</u>, 247 F.3d 423, 429 (2d Cir. 2001).

The "primary purpose of the contracting parties to the Convention," however, was to "limit[] the liability of air carriers." <u>Eastern Airlines, Inc. v. Floyd</u>, 499 U.S. 530, 546 (1991). Our own jurisprudence suggests that in "order to further the goals of uniformity and liability limitation, the Convention's

17

provisions must be construed broadly.  Indeed, the purposes of the Convention must be furthered to the greatest extent possible." <u>Onyeanusi v. Pan Am</u>, 952 F.2d 788 (3d Cir. 1992) (internal quotations and citations omitted).  To read Article 8(c) as imposing the draconian requirement that a carrier anticipate and list <u>all</u> stopping places in order to qualify for limited liability protection is certainly not a "broad" interpretation that furthers the goal of limited liability for carriers to the "greatest extent possible."

Instead, the majority's interpretation embraces the narrowest possible understanding of Article 8(c) by failing to consider the significance of the latter portion of the provision. That portion states that "if [the carrier] exercises [the right to alter the stopping places] the alterations shall not have the effect of depriving the transportation of its international character."

18

This safety valve ensures that all parties to the contract understand and agree that the transportation in question qualifies for limited liability protection under the Warsaw Convention regardless of any alternate route that the carrier may select out of necessity. As the District Court explained, the inclusion of a safety valve demonstrates that the "driving force of 8(c) as a whole is to ensure notice and acknowledgment, not as to every stop, but as to stops [that] pertain to and indicate the international character of the flight." Dist. Ct. Op. at 22.

The majority contends that the "meaning the District Court gave to the language of 8(c) requires an additional caveat that simply does not appear in the text." Part II, supra at [9]. To the contrary, it is the majority's reading of Article 8(c) that imposes upon carriers a burden far heavier than the provision requires. To further the purpose of the Warsaw Convention to

19

the "greatest extent possible," as mandated by <u>Onyeanusi</u>, this Court should read Article 8(c) as imposing a requirement that carriers list only those "agreed stopping places" that might impact the international character of the flight and thus the availability of limited liability protection to the carrier.[8]

---

[8] Although the District Court did not reach its conclusion on the issue of limited liability via application of the Hague Protocol to the facts of this case, to do so, I believe, would have lent further support to the court's analysis. I respectfully disagree with the majority's contention that the "later change effectuated by the Hague Protocol could just as easily be viewed as changing and restricting, rather than clarifying, the exceptions for limited liability." Part II, at [9]. The Hague Protocol did not furnish a different definition for the phrase "agreed stopping places," but merely clarified that only an interim stop that affected the international character of the shipment qualified as such an "agreed stopping place." Courts have recognized that if an "amendment clarifies prior law rather than changing it, no concerns about retroactive application arise and the amendment is applied to the present proceeding as an accurate restatement of prior law." <u>Piamba Cortes v. American Airlines, Inc.</u>, 177 F.3d 1272, 1283 (11th Cir. 1999).

For these reasons, I respectfully dissent.