INSURANCE COMPANY OF NORTH AMERICA, a corporation; Zomaya Group, Inc., a corporation, Plaintiffs–Appellants,

v.

FEDERAL EXPRESS CORPORATION, a corporation, Defendant–Appellee.

No. 98–56309.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted March 10, 1999.

Decided Aug. 30, 1999.

Marsha L. Morrow (argued), John H. Quinn and Robert C. Chiles, Long & Levit, San Francisco, California, for the plaintiffs-appellants.

Patrick J. Keating (argued), Kaplan, Begy, & von Ohlen, Chicago, Illinois, David R. Shane (argued), Shane & Taitz, San Francisco, CA, for the defendant-appellee.

Before: O'SCANNLAIN, WARDLAW, and W. FLETCHER, Circuit Judges.

WARDLAW, Circuit Judge:

At approximately 11:00 p.m. on December 20, 1995, a shipment of computer memory modules disappeared from the storage area of the Memphis, Tennessee hub of the Federal Express Corporation ("Federal Express"). The intended recipient, Zomaya Group, Inc. ("Zomaya"), and its insurer, Insurance Company of North America,[1] sued Federal Express for a loss of $745,000 in California Superior Court. After Federal Express removed the case to federal court, the district court granted summary judgment in favor of Federal Express, limiting Federal Express' liability to $2,494.25 under the terms of the Convention for the Unification of Certain Rules Relating to International Transportation by Air, Oct. 12, 1929, 49 Stat. 3000, 3014, T.S. No. 876 (1934), *reprinted in* note following 49 U.S.C. § 40105 (the "Warsaw Convention" or the "Convention"). We have jurisdiction under 28 U.S.C. § 1291, and we affirm.

## I

The facts are not in dispute. Zomaya, a business in Irvine, California, purchased $638,500 worth of computer memory modules from Zorin Systems Corp. ("Zorin"), a Canadian company. When Zorin shipped the memory modules to Zomaya, it used a computer terminal provided by Federal Express. This terminal automates the preparation of certain shipping documents, including international air waybills.[2] The terminal generates air waybills onto two-sided proprietary Federal Express labels. The reverse side of the label sets forth the "CONDITIONS OF CONTRACT FOR INTERNATIONAL SHIPMENTS" (hereinafter the "conditions"). The conditions expressly incorporate the "FedEx Service Guide" and all applicable tariffs.[3] The conditions also contain a contractual limitation of liability[4] and disclaim any agreement as to specific stopping places for the shipment, providing: "You

---

1. For convenience, we collectively refer to appellants as "Zomaya."

2. An air waybill is a written document describing the shipping arrangement between the air carrier and the shipper. It includes, among other things, the point of origin and destination and a description of the goods included in the shipment. *See* Warsaw Convention, Arts. 5–16; *see also Black's Law Dictionary* 1593 (6th ed. 1990).

3. The conditions provide, in pertinent part:

   By giving us your shipment you agree, regardless of whether you sign the front of this Air Waybill, for yourself and as an agent for and on behalf of any other person having an interest in this shipment, to all terms on this NON–NEGOTIABLE Air Waybill, in any applicable tariff, and in our current Service Guide or Standard Conditions of Carriage, copies of which are available upon request.

4. This contractual limitation of liability references the Warsaw Convention:

   NOTICE CONCERNING LIMITATIONS OF LIABILITY. Air Carriage Notice. If the carriage of your shipment by air involves an ultimate destination or stop in a country other than the country of departure, the Warsaw Convention, an international treaty relating to international carriage by air, may be applicable, which treaty would then govern and in most cases limit our liability for loss or delay of or damage to your shipment. In the U.S. the Warsaw Convention limits our liability to U.S. $9.07 per pound (U.S. $20.38 per kilogram). . . .

agree that this shipment may be carried via intermediate stopping places that we deem appropriate." Finally, the correlative passage in the applicable "FedEx Service Guide" reserves to Federal Express the right to route its shipments as it sees fit.[5]

On December 16, 1995, a Federal Express courier picked up the shipment of computer modules from Zorin in Mississauga, Ontario, Canada. Four days later, the shipment vanished from a "secure" holding facility located in the Federal Express hub on the grounds of the Memphis International Airport, where many international shipments are held while awaiting clearance through United States Customs. Although the investigating authorities made no arrests, the undisputed facts strongly suggest that the computer modules were stolen by an employee of Federal Express.

Zomaya sued Federal Express in California Superior Court for negligence and wilful misconduct in connection with the cargo loss. Federal Express removed the case to federal district court for the Central District of California under 28 U.S.C. §§ 1331, 1332, and 1441. Federal Express asserted that its liability was governed by the Warsaw Convention and thereby limited to $9.07 per pound of lost cargo. Zomaya countered by arguing that Federal Express could not avail itself of the Warsaw Convention's limited liability provisions for two reasons, either of which would preclude limited liability under the Convention. First, Zomaya claimed that the air waybill provided by Federal Express did not list Memphis as an "agreed stopping place" as required by Article 8(c) of the Convention. Alternatively, Zomaya argued that Federal Express was guilty of "wilful misconduct" as defined in Article 25. Zomaya and Federal Express filed cross-motions for summary judgment.

The district court awarded summary judgment to Federal Express. The court first concluded that the air waybill complied with the particulars set forth in Article 8. Specifically, the court determined that Federal Express satisfied the "agreed stopping places" requirement of Article 8(c), relying on the air waybill's preprinted disclaimers. As to the wilful misconduct issue, the district court applied California law and held that the theft of the cargo by a Federal Express employee could not be imputed to Federal Express under the terms of the Warsaw Convention. Accordingly, the district court limited Federal Express' liability to $9.07 per pound of computer modules shipped, which amounted to $2,494.25.

Zomaya timely appealed the district court's grant of summary judgment, renewing the arguments it had forwarded before the district court. Our review is *de novo.* See *Margolis v. Ryan,* 140 F.3d 850, 852 (9th Cir.1998).

## II

The Warsaw Convention is an international treaty governing the liability of air carriers engaged in the international transportation of passengers and cargo. The Convention creates a presumption of air carrier liability but, in turn, substantially limits that liability. *See* Warsaw Convention, Arts. 18, 22(2). Under this regime, an air carrier may be held strictly liable for loss or damage to goods incurred during the course of international transportation, but the Convention places a $9.07–per–pound ceiling on recovery. *See id.* To invoke this limited liability protection, a carrier must comply with the Convention's many procedural and substantive provisions. Three such provisions shape our analysis here. Specifically, we are called upon to determine the scope of Fed-

---

**5.** This passage provides, in pertinent part:
   Routing and Re–Routing. FedEx will determine the routing of all shipments. There are no stopping places which are agreed to at the time of tender of the shipment. We reserve the right to divert any shipment in order to expedite its delivery (including the use of other carriers).

eral Express' liability under (1) Articles 8 and 9, which govern the issuance of air waybills; and (2) Article 25, which deprives a carrier of limited liability for damage caused by its "wilful misconduct."

■ We address each issue in turn.[6]

## A

■ Zomaya first contends that the district court erred in holding that the air waybill provided by Federal Express complied with the requirements set forth in Article 8 of the Convention. Article 8 enumerates seventeen "particulars" to which an air waybill must conform. *See* Warsaw Convention, Art. 8(a)-(q). The penalty for noncompliance with these particulars is found in Article 9, which cautions that "if the air waybill does not contain all the particulars set out in article 8(a) to (i), inclusive, ... the carrier shall not be entitled to avail himself of the provisions of this convention which exclude or limit his liability." *Id.*, Art. 9.

As relevant here, Article 8(c) requires that any "agreed stopping places" must appear on the air waybill.[7] Zomaya argues that the air waybill's failure to indicate that the shipment would make an intermediate stop in Memphis violates the "agreed stopping places" mandate of Article 8(c). Conversely, Federal Express argues that it was under no obligation to disclose the stop in Memphis. We agree with Federal Express.

Our analysis begins, as it must, with the text of the Convention. *See El Al Israel Airlines, Ltd. v. Tseng*, 525 U.S. 155, 119 S.Ct. 662, 671, 142 L.Ed.2d 576 (1999) ("Our inquiry begins with the text of [the Convention]...."); *Eastern Airlines, Inc. v. Floyd*, 499 U.S. 530, 534, 111 S.Ct. 1489, 1493, 113 L.Ed.2d 569 (1991) ("When interpreting a treaty, we begin with the text of the treaty and the context in which the written words are used.") (internal quotation marks omitted). As the Supreme Court directed in *Chan v. Korean Air Lines, Ltd.*, 490 U.S. 122, 134, 109 S.Ct. 1676, 1683, 104 L.Ed.2d 113 (1989):

> We must thus be governed by the text-solemnly adopted by the governments of many separate nations-whatever conclusions might be drawn from the intricate drafting history that petitioners and the United States have brought to our attention. The latter may of course be consulted to elucidate a text that is ambiguous. But where the text is clear, as it is here, we have no power to insert an amendment.

(internal citation omitted).

Employing these principles of construction, it becomes clear that we must end our inquiry precisely where it begins. The text of Article 8(c) requires only that the air waybill contain "agreed stopping places." Here, the parties did not agree that the shipment of computer modules would stop in Memphis. Rather, the air waybill made it perfectly clear that there

---

**6.** Federal Express argues that Zomaya provided insufficient notice of the lost cargo under the terms of the air waybill. This argument is an attempt to modify the district court's judgment so that it would incur no liability, rather than limited liability, which would constitute greater relief than that awarded Federal Express by the district court. As a result, this argument is not properly before us as Federal Express failed to file a cross appeal. *See Engleson v. Burlington N. R.R. Co.*, 972 F.2d 1038, 1042 (9th Cir.1992) (holding that where "an appellee seeks to modify a judgment, he or she must file a cross appeal"); *cf. United States v. Hilger*, 867 F.2d 566, 567 (9th Cir. 1989) (holding that an appellee need not cross-appeal as he or she was "not trying to

obtain more relief from the court of appeals than he received from the district court").

**7.** Article 8 provides, in pertinent part:

> The air waybill shall contain the following particulars:
> ...
> (c) The agreed stopping places, provided that the carrier may reserve the right to alter the stopping places in case of necessity, and that if he exercises that right the alteration shall not have the effect of depriving the transportation of its international character.

Warsaw Convention, Art. 8.

were no agreed stopping places. Federal Express explicitly reserved the right to route the shipment as it saw fit. Accordingly, Federal Express was under no obligation to disclose the intermediate stop in Memphis. The text of Article 8(c) is not susceptible to any other conclusion, and therefore, the district court did not err in holding that Federal Express had issued a conforming air waybill.

## B

■ Zomaya next argues that the district court erred in concluding that Federal Express had not committed wilful misconduct under Article 25 of the Convention when one of its employees stole the shipment of computer modules. Article 25 provides:

> (1) The carrier shall not be entitled to avail himself of the provisions on this convention which exclude or limit his liability, if the damage is caused by his wilful misconduct or by such default on his part as, in accordance with the law of the court to which the case is submitted, is considered to be equivalent to wilful misconduct.
>
> (2) Similarly the carrier shall not be entitled to avail himself of the said provisions, if the damage is caused under the same circumstances by an agent of the carrier acting within the scope of his employment.

Warsaw Convention, Art. 25. Although Article 25(2) does not contain the term wilful misconduct, the conjunctive word "similarly" and the subsection's use of the phrase "under the same circumstances" as a surrogate for the term wilful misconduct makes it clear that Article 25 precludes limited liability for both the carrier's own wilful misconduct as well as that wilful misconduct that may be imputed to it. *See Brink's Ltd. v. South African Airways,* 93 F.3d 1022, 1028 (2d Cir.1996) ("The language of Article 25(1), [is] adopted in subsection (2) by use of the word "similarly...."). As the Second Circuit correctly explained in *Brink's Limited:*

Article 25(2) makes it clear that an air carrier is liable for the wilful misconduct of its employees acting within the scope of their employment. More pertinently, Article 25(1) makes it clear that wilful misconduct must be defined "in accordance with the law of the court to which the case is submitted."

*Id.*

There are no allegations that Federal Express itself engaged in wilful misconduct or the equivalent thereof. Rather, the dispute is whether the employee's theft of the modules may be deemed to be wilful misconduct on the part of Federal Express "in accordance with the law of the court to which the case is submitted." As set forth more fully below, we are duty-bound in this diversity case to apply the law of California in order to give meaning to the term wilful misconduct. California law, in turn, leads us to conclude that the theft, which exposed the company to liability and served only the personal interests of the employee, cannot be imputed to Federal Express.

### 1

■ In fleshing out the contours of the term wilful misconduct, our task is circumscribed by the requirement in Article 25(1) that we resolve the issue "in accordance with the law of the court to which the case is submitted." Thus, before we can determine whether the theft of the modules constituted wilful misconduct that can be imputed to Federal Express under Article 25(2), we are presented at the outset with a question of choice of law.

■ In an ordinary diversity case, federal courts apply the substantive law of the forum in which the court is located, including the forum's choice of law rules. *See Klaxon Co. v. Stentor Elec. Mfg. Co.,* 313 U.S. 487, 496, 61 S.Ct. 1020, 1021–22, 85 L.Ed. 1477 (1941); *Erie R.R. Co. v. Tompkins,* 304 U.S. 64, 78, 58 S.Ct. 817, 822, 82 L.Ed. 1188 (1938). Although an international treaty governs the liability between

the parties in the instant dispute, our choice of law analysis under the Warsaw Convention is no different than it would be under the familiar *Erie* doctrine. This is so because the Supreme Court has "admonished lower courts to refrain from developing federal common law 'under cover' of advancing the goal of uniformity in Warsaw Convention cases." *See Brink's Ltd.*, 93 F.3d at 1029 (quoting *Zicherman v. Korean Air Lines Co.*, 516 U.S. 217, 229, 116 S.Ct. 629, 636, 133 L.Ed.2d 596 (1996)).

In *Zicherman*, the Court addressed the question of whether a plaintiff, under Articles 17 and 24 of the Warsaw Convention, "may recover damages for loss of society resulting from the death of a relative in a plane crash on the high seas." 516 U.S. at 219, 116 S.Ct. at 631.[8] Recognizing the inherent ambiguity of the word "damage" in Article 17, the Court concluded that the Convention "leaves it to the adjudicating courts" to specify what the term means. *Id.* at 224, 116 S.Ct. at 633. The Court also interpreted Article 24 as leaving the availability of remedies unresolved, holding that the Convention defers to private international law for resolution of such questions. *See id.* at 228, 116 S.Ct. at 635. The Court concluded:

Undoubtedly it was a primary function of the Warsaw Convention to foster uniformity in the law of international air travel, but ... this is not an area in which the imposition of uniformity was found feasible. The Convention neither adopted any uniform rule of its own nor authorized national courts to pursue uniformity in derogation of otherwise applicable law.

*Zicherman*, 516 U.S. at 230, 116 S.Ct. at 636 (internal citations omitted). The Court therefore characterized both articles as "pass-through" provisions, explaining that "Congress may choose to enact special provisions applicable to Warsaw–Convention cases, as some countries have done.... Absent such legislation, however, Articles 17 and 24(2) provide nothing more than a pass-through, authorizing us to apply the law that would govern in absence of the Warsaw Convention." *Id.* at 229, 116 S.Ct. at 636.

The Second Circuit has employed this "pass-through" approach in giving meaning to the term wilful misconduct as set forth in Article 25, holding that:

Article 25 of the Warsaw Convention defers to the law of the forum jurisdiction for a determination of what conduct constitutes "wilful misconduct" by an air carrier. When a Warsaw Convention action is filed in a United States district court and no federal statute governs, the law of the United States for purposes of Article 25 is the law of the state in which the district court sits. In applying the law of the forum jurisdiction, federal courts must also apply that state's choice of law rules.

*Brink's*, 93 F.3d at 1030 (citations omitted). We agree with our sister circuit; the *Zicherman* pass-through framework resonates with equal force in the Article 25 context. By its express language, Article 25 defers to the law of the forum jurisdiction, evidencing that the drafters of the Convention chose not to adopt a uniform rule of wilful misconduct. We therefore refrain from fashioning a federal common law meaning to the term wilful misconduct

8. Article 17 provides that "[t]he carrier shall be liable for damage sustained in the event of the death or wounding of a passenger or any other bodily injury suffered by a passenger, if the accident which caused the damage so sustained took place on board the aircraft or in the course of any of the operations of embarking or disembarking." Warsaw Convention, Art. 17. Article 24 reads:

(1) In the cases covered by articles 18 and 19 any action for damage, however founded, can only be brought subject to the conditions and limits set out in this convention (2) In the cases covered by article 17 the provisions of the preceding paragraph shall also apply, without prejudice to the questions as to who are the persons who have the right to bring suit and what are their respective rights.

Warsaw Convention, Art. 24.

"in derogation of otherwise applicable law." *Zicherman,* 516 U.S. at 231, 116 S.Ct. at 636. Accordingly, because Zomaya initiated this lawsuit in the United States District Court for the Central District of California, California law, and its applicable choice of law rules, govern.

### 2

■■ Having determined that California is the relevant forum, we next consider what law California state courts would apply in resolving the issue of Federal Express' alleged "wilful misconduct." California has adopted the "governmental interest" test as its choice of law test for tortious conduct. *See Arno v. Club Med. Inc.,* 22 F.3d 1464, 1467 (9th Cir.1994). We have described our role under this test as follows:

> Under this amorphous and somewhat result-oriented approach, we must first consider whether the two states' laws actually differ; if so, we must examine each state's interest in applying its law to determine whether there is a 'true conflict'; and if each state has a legitimate interest we must compare the impairment to each jurisdiction under the other's rule of law.

*Arno,* 22 F.3d at 1467 (citing *McGhee v. Arabian American Oil Co.,* 871 F.2d 1412, 1422 (9th Cir.1989)) (additional citations omitted). "Only if each of the states involved has a legitimate but conflicting interest in applying its own law will we be confronted with a true conflicts case." *Offshore Rental Co. v. Continental Oil Co.,* 22 Cal.3d 157, 163, 148 Cal.Rptr. 867, 583 P.2d 721 (1978) (quotations omitted). If there is no "true conflict," then the forum "is entitled to apply its own law." *Rivera v. Southern Pacific Transp. Co.,* 217 Cal. App.3d 294, 299, 266 Cal.Rptr. 11 (1990).

We conclude that California law applies.[9] The parties have given only per-functory attention to the substantive differences between the laws of California and Canada.[10] We therefore see no need to engage in a lengthy exegesis of Canadian tort law. Even if Canadian law differed from California law on the issue of imputing an employee's wilful misconduct to the employer, this case still presents no true conflict, a point repeatedly conceded by Zomaya. Moreover, as the district court correctly concluded, "California's interests appear to exceed those of any relevant jurisdiction." Indeed, the theft did not occur in Canada; there are no Canadian parties to the litigation; and most significantly, the injured party, Zomaya, is a California business that suffered harm in California as a result of a theft in Tennessee. *Cf. Denham v. Farmers Ins. Co.,* 213 Cal.App.3d 1061, 1066, 262 Cal.Rptr. 146 (1989) (holding that California has no "legitimate interest" in deterring misconduct in Nevada but does have a "legitimate interest" in compensating California victims for such misconduct); *see generally* 5 Witkin, *Summary of California Law* (Torts) § 336 (9th ed.1988) (explaining that the "law of the *state of injury* will usually be applied, because persons who cause injury in a state should not escape liability under that state's law . . .") (emphasis in original). Although Zomaya correctly posits that California has no interest in limiting its recovery, it cites no authority suggesting that California, under the governmental interest test, might have an interest in applying non-California law in order to redress injuries of California residents such as Zomaya. Accordingly, because this case presents no true conflict, California "is entitled to apply its own law." *Rivera,* 217 Cal.App.3d at 299, 266 Cal.Rptr. 11.

### 3

■ We turn to our final query, *i.e.,* deciding whether California law would im-

---

9. The air waybill itself contains no choice of law clause other than its general reference to the applicability of the Warsaw Convention. *See supra* note 4.

10. Neither of the parties has urged the application of Tennessee law, the only other jurisdiction with a connection to the dispute.

pute the employee's theft of the computer module shipment to Federal Express under the Convention's rubric of wilful misconduct. We conclude that the California case law provides the answer with a resounding no. In *Lisa M. v. Henry Mayo Newhall Memorial Hosp.*, 12 Cal.4th 291, 297, 48 Cal.Rptr.2d 510, 907 P.2d 358 (1995), the California Supreme Court considered "the connection required between an employee's intentional tort and his or her work so that the employer may be held vicariously liable." The court explained that, "while the employee [ ] need not have intended to further the employer's interests, the employer will not be held liable for an assault or other intentional tort that did not have a causal nexus to the employee's work." *Id.* The court defined the "causal nexus" requirement by stating that, "an intentional tort gives rise to respondeat superior liability only if it was engendered by the employment" or arose therefrom. *Id.* at 298, 48 Cal.Rptr.2d 510, 907 P.2d 358. The court then logically concluded that, "[a]n act serving only the employee's personal interest is less likely to arise from or be engendered by the employment than an act that, even if misguided, was intended to serve the employer in some way." *Id.*

Here, we would be hard-pressed to find that the employee's thievery served Federal Express' interests in any way. The theft exposed Federal Express to liability under the Warsaw Convention, potential loss of business, damage to its reputation, legal fees, and other harms that normally arise from employee theft. Moreover, the mere fact that the employee had access to the "secure" holding area by way of his employment with Federal Express does not change the result. As the *Lisa M.* court noted:

> That the employment brought tortfeasor and victim together in time and place is not enough. We have used varied language to describe the nature of the required additional link ...: the incident leading to the injury must be an 'out-

growth' of the employment ... or 'typical of or broadly incidental to the enterprise [the employer] has undertaken'. *Id.*

Zomaya nevertheless argues that our decision in *Koirala v. Thai Airways*, 126 F.3d 1205 (9th Cir.1997), mandates a different result. In *Koirala*, we considered whether an airline was liable for damages under the Warsaw Convention for a plane crash which resulted because of the wilful misconduct of the employee flight crew. *See id.* at 1210–11. The crew had failed to discern that the plane had strayed from its charted course, a failure which led to the crash. *See id.* Notwithstanding Zomaya's arguments to the contrary, *Koirala* proves unavailing, for the conduct at issue in *Koirala* is easily distinguishable from the conduct here. In *Koirala*, the employee's "conscious and reckless disregard of their duties" was clearly an outgrowth of, or engendered by, or within the scope of their employment. The employees were the flight crew, and their wilful misconduct occurred as they performed their functions *as the flight crew* recklessly. *See id.* Accordingly, we properly imputed the crew's wilful misconduct to the employer and precluded limited liability under the Convention.

Our conclusion is buttressed by the holding of the California Supreme Court in *Hinman v. Westinghouse*, 2 Cal.3d 956, 960, 88 Cal.Rptr. 188, 471 P.2d 988 (1970), where the court stated that respondeat superior liability should attach only for "the more or less inevitable toll of a lawful enterprise." Thus, "the cases which have considered recovery against the master for accidents occurring within the scope and during the period of employment have established a general rule of liability with a few exceptions for cases where the employee has substantially deviated from his duties for personal purposes." *Id.* Here, it is beyond dispute that the theft was a substantial deviation from the employee's duties and served only the personal purposes of individual gain at the expense of

the employer. Accordingly, respondeat superior liability does not obtain, the wilful misconduct of the employee should not be imputed to Federal Express, and the limited liability provisions of the Warsaw Convention should, and do, apply.

### III

For the foregoing reasons, we affirm the district court's order granting summary judgment in favor of Federal Express.

AFFIRMED.

W. FLETCHER, Circuit Judge, concurring:

I agree with the result reached by the panel but disagree with the legal analysis in part IIB of its opinion.

Article 25(1) of the Warsaw Convention provides that a carrier is entitled to limited liability for loss or damage unless "damage is caused by his wilful misconduct or by such default on his part as, *in accordance with the law of the court to which the case is submitted,* is considered to be the equivalent to wilful misconduct" (emphasis added). In part IIB of its opinion, the panel concludes that "the law of the court to which the case is submitted" is California law. I conclude that it is federal common law.

The analysis proceeds in three steps. First, Article 25(1) of the Warsaw Convention operates as a "pass-through," directing us to apply "domestic" law. The domestic law to which we are directed is, in the words of the Supreme Court, "the law that would govern in the absence of the Warsaw Convention." *Zicherman v. Korean Air Lines Co.,* 516 U.S. 217, 229, 116 S.Ct. 629, 133 L.Ed.2d 596 (1996). Second, in the absence of the Warsaw Convention this case is governed by federal common law, not California law. *See Read–Rite Corp. v. Burlington Air Express Ltd.,* 186 F.3d 1190 (9th Cir.1999); *Deiro v. American Airlines, Inc.,* 816 F.2d 1360, 1364 (9th Cir.1987); *Klicker v. Northwest Airlines, Inc.,* 563 F.2d 1310, 1313 (9th Cir.1977);

*see also Sam L. Majors Jewelers v. ABX, Inc.,* 117 F.3d 922, 926–29 (5th Cir.1997). Federal common law has preempted state law in this area since at least 1918, and this preemption has been preserved by the federal Airline Deregulation Act of 1978 ("ADA"), 49 U.S.C. §§ 40120(c), 41713(b)(1). *See Boston & Maine R.R. v. Piper,* 246 U.S. 439, 444, 38 S.Ct. 354, 62 L.Ed. 820 (1918); *American Airlines, Inc. v. Wolens,* 513 U.S. 219, 232–33, 115 S.Ct. 817, 130 L.Ed.2d 715 (1995) ("The ADA's preemption clause ... read together with the FAA's saving clause, stops States from imposing their own substantive standards with respect to rates, routes, or services...."). Third, established federal common law allows the carrier to limit its liability as it has done here. *See Read–Rite,* 186 F.3d 1190, 1197; *Deiro,* 816 F.2d at 1364; *Klicker,* 563 F.2d at 1313; *Glickfeld v. Howard Van Lines, Inc.,* 213 F.2d 723, 727 (9th Cir.1954); *see also Sam L. Majors Jewelers,* 117 F.3d at 926–29 (5th Cir.1997); *Hill Constr. Corp. v. American Airlines, Inc.,* 996 F.2d 1315, 1317, 1319–20 (1st Cir.1993).

### I

The Warsaw Convention broadly protects carriers providing international air transportation from full liability for damage or loss of cargo. One exception to the Convention's protection from full liability is found at Article 25(1). Under that article, if the carrier commits "wilful misconduct," or "such default" as "in accordance with the law of the court to which the case is submitted, is considered to be the equivalent to wilful misconduct," then the carrier can be held fully liable. We have previously interpreted the term "wilful misconduct," *see, e.g., Koirala v. Thai Airways Int'l., Ltd.,* 126 F.3d 1205, 1210 (9th Cir.1997), but we have not, until this case, determined when a carrier may be fully liable because of "such default" in accordance with "the law of the court which the case is submitted."

I agree with the majority that the plain language of Article 25(1) requires us to look beyond the Convention to the domestic law that would apply in its absence. This conclusion is compelled by *Zicherman v. Korean Air Lines Co.*, 516 U.S. 217, 116 S.Ct. 629, 133 L.Ed.2d 596 (1996). In *Zicherman*, the question was whether a plaintiff could recover damages under Article 24(1) of the Warsaw Convention for loss of society resulting from the death of a relative in a plane crash on the high seas. A federal statute, the Death on the High Seas Act (DOHSA), 46 U.S.C. § 761 *et seq.*, precluded such damages. But the Second Circuit chose not to apply the federal statute, and held instead that general maritime law supplied the substantive law of compensatory damages. *See Zicherman v. Korean Air Lines Co.*, 43 F.3d 18, 21–22 (2d Cir.1994).

The Supreme Court reversed, holding that the federal statute rather than general maritime law should have been applied. The Second Circuit's holding would have created a uniform rule for airplane crashes over land and over water, applying the general maritime law to both, but the Supreme Court held that existing federal law, in the absence of the Warsaw Convention, provided for application of different federal laws. The general maritime law applied (somewhat paradoxically) to crashes on land, while DOHSA applied to crashes on the high seas. The relevant point, for purposes of our analysis, is that the Warsaw Convention directed a pass-through to existing law, whatever that law happened to be. It did not provide authority for the Court of Appeals to construct a uniform rule where none had existed before. According to the Supreme Court, "[t]he Convention neither adopted any uniform rule of its own nor authorized national courts to pursue uniformity in derogation of otherwise applicable law." *Zicherman*, 516 U.S. at 230–31, 116 S.Ct. 629. Rather, when the Warsaw Convention directs a pass-through to domestic law, we apply "the law that would govern in the absence of the

Warsaw Convention." *Zicherman*, 516 U.S. at 229, 116 S.Ct. 629.

## II

Unfortunately, neither party in this case cited *Zicherman* or appears to have understood its requirement that we look to "the law that would govern in the absence of the Warsaw Convention." Plaintiff Zomaya argued for the application of Canadian law, but in the alternative contended that FedEx is fully liable under California's common carrier statutes. *See* Cal. Civ. Code §§ 2175 and 2194. Defendant FedEx maintained that California's common law of respondeat superior precludes holding FedEx liable for theft by its employees. *See Lisa M. v. Henry Mayo Newhall Memorial Hosp.*, 12 Cal.4th 291, 297, 48 Cal.Rptr.2d 510, 907 P.2d 358 (1995). Neither party addressed the question of what law would govern in the absence of the Convention, and neither party addressed the question of whether California law is preempted by federal common law.

The validity of limitation of liability clauses in contracts for interstate carriage of goods has been governed by preempting federal common law since at least 1918. In 1887, Congress passed the Interstate Commerce Act, 24 Stat. 379, and nineteen years later passed the Hepburn Act, 34 Stat. 584. Both statutes regulated railroads, the most important interstate carrier at the time. The Hepburn Act contained a provision known as the Carmack Amendment, which, as later interpreted by the Supreme Court, entirely preempted state regulation of common carriers. *Adams Express Co. v. Croninger*, 226 U.S. 491, 505, 33 S.Ct. 148, 57 L.Ed. 314 (1913). After the passage of the Carmack Amendment, the Supreme Court continued to follow the old general common law rules concerning limitations of liability, but transformed them into rules of federal common law binding in state courts as well as federal courts. *See, e.g., Boston & Maine R.R.*, 246 U.S. at 444, 38 S.Ct. 354 (1918) (applying federal

common law rule of limitation of liability in a case originating in Vermont state court).

Common carriers providing air transportation have been regulated by a system of federal statutes and federal common law similar to what Congress and the courts originally developed for railroads. Since 1938, three significant federal statutes have regulated (and later deregulated) common carriers by air: the Civil Aeronautics Act of 1938, 52 Stat. 973 ("CAA"); the Federal Aviation Act of 1959, 72 Stat. 731 ("FAA"); and the Airline Deregulation Act of 1978, 92 Stat. 1705 ("ADA"). These three Acts have always had "saving clauses" preserving remedies at common law. For example, the FAA preserved "the remedies now existing at common law or by statute...." 49 U.S.C.App. § 1506 (1988).[1] Before and after the passage of the ADA in 1978, we have held that Congress has preserved the federal common law applicable to the limited liability provisions of air carrier contracts. See Klicker, 563 F.2d at 1313 ("[W]hether a tariff is against public policy is ultimately a judicial question requiring the application of federal common law."); Deiro, 816 F.2d at 1365 ("The federal common law applicable to carriers was not changed with the advent of regulation air carriers [and] the subsequent deregulation of air carriers in 1978 did not change the applicability or substantive content of the relevant federal common law."); Read–Rite, 186 F.3d 1190, 1195 ("[F]ederal common law applies to loss of or damage to goods by interstate common carriers by air.")

Congress has not merely preserved federal common law. It has also expressly preempted any state law governing the validity of limited liability contracts of air carriers. See, e.g., Read–Rite, 186 F.3d 1190, 1197 ("[S]tate law regulating the scope of air carrier liability for loss or damage to cargo is preempted by the ADA.") The ADA provides that states

"may not enact or enforce a law, regulation, or other provision having the force and effect of law related to a price, route, or service of an air carrier...." 49 U.S.C. § 41713(b). In Wolens, 513 U.S. at 232, 115 S.Ct. 817, the Supreme Court explained that the application of state contract law to "routine breach-of-contract claims" is not preempted by the ADA, because Congress never intended "to channel into federal courts the business of resolving, pursuant to judicially fashioned federal common law, the range of contract claims relating to airline rates, routes or services." Following Wolens, we have recently held that in adopting the ADA "Congress did not intend to preempt passengers' run-of-the-mill personal injury claims" related to "in-flight beverages, personal assistance to passengers, the handling of luggage, and similar amenities." Charas v. Trans World Airlines, Inc., 160 F.3d 1259, 1261 (9th Cir.1998) (en banc). Such "services" are only related to the purpose of federal airline deregulation in a "peripheral manner." Id. at 1265 (quoting Morales v. Trans World Airlines Inc., 504 U.S. 374, 390, 112 S.Ct. 2031, 119 L.Ed.2d 157 (1992)).

But a court deciding whether air carriers are permitted to enter into contracts limiting their liability for loss of or damage to shipped cargo faces neither a "routine" contract claim, as was presented in Wolens, nor "run-of-the-mill" injury claims, as were presented to us in Charas. In Wolens, the Court stated:

The ADA's preemption clause ... read together with the FAA's saving clause, stops States from imposing their own substantive standards with respect to rates, routes, or services, but not from affording relief to a party who claims and proves that an airline dishonored a term the airline itself stipulated. This distinction between what the State dictates and what the airline itself under-

---

1. The FAA saving clause was re-enacted in 1994 and simply stated that "remedies provided by law" are preserved, but this change was not intended to have any substantive effect. 49 U.S.C. § 40120(c).

takes confines courts, in breach-of-contract actions, to the parties' bargain, with no enlargement or enhancement based on state laws or policies external to the agreement.

*Wolens*, 513 U.S. at 232–33, 115 S.Ct. 817. The scope of limited liability of an air carrier for loss or damage to cargo is directly related to the carrier's rates and services and goes to the very heart of the ADA. Allowing states to decide individually whether a common air carrier may limit its liability would "significantly impact federal deregulation," *Charas*, 160 F.3d at 1265, and would "adversely affect the economic deregulation of the airlines and the forces of competition within the airline industry," *id.* at 1261. Indeed, one of the central purposes of the ADA was "encouraging and developing an expedited all-cargo air transportation system provided by private enterprise...." 49 U.S.C. § 40101. Deciding whether FedEx may contractually limit its liability is a matter of "substantive standards" based on "policies external to the agreement," *Wolens*, 513 U.S. at 232–33, 115 S.Ct. 817, and any state law purporting to decide that question is preempted by the ADA.

Not surprisingly, given preemption of state law by federal common law since at least 1918 and express federal statutory preemption since 1978, we have consistently applied federal common law to determine whether air carriers may limit their liability for cargo loss or damage. In *Klicker*, a prized golden retriever died in the charge of Northwest Airlines, and we applied federal common law to the question of whether Northwest Airlines could enforce a contractual provision exempting it from liability. 563 F.2d at 1311, 1313. Nine years after the passage of the ADA, in *Deiro*, we were again presented with the death of prized dogs in the charge of an air carrier. We held that the "deregulation of air carriers in 1978 did not change the applicability or substantive content of the relevant federal common law," and we applied federal common law to hold valid the

limited liability provisions of American Airlines' contract. 816 F.2d at 1361, 1365–66. In so holding, we followed our earlier decision in *Klicker* and the decision of the Third Circuit in *First Pennsylvania Bank v. Eastern Airlines, Inc.*, 731 F.2d 1113, 1122 (3rd Cir.1984). The Fifth Circuit recently followed both *Deiro* and *First Pennsylvania Bank* in holding that the loss of or damage to cargo carried by an interstate common air carrier gives rise to a federal common law cause of action, and that any state law cause of action for the loss is preempted by the ADA. *See Sam L. Majors Jewelers*, 117 F.3d at 926–31. And as recently as this month, we applied federal common law to hold valid a limitation of liability clause in a contract for shipment by air of valuable machinery from England to California. *See Read–Rite*, 186 F.3d 1190.

It can hardly be argued that application of an established federal common law rule dating from the Supreme Court's 1918 decision in *Boston & Maine R.R.*, and recently followed by this court in *Read–Rite*, *Deiro* and *Klicker*, would be an improper intrusion upon the law-making powers of either Congress or the states. Although settings in which federal common law is applied are "few and restricted," the Supreme Court has held that the application of federal common law is appropriate where there is a "significant conflict between some federal policy or interest and the use of state law." *O'Melveny & Myers v. FDIC*, 512 U.S. 79, 87, 114 S.Ct. 2048, 129 L.Ed.2d 67 (1994) (internal quotation marks omitted). Further, the Court "require[s] the existence of such a conflict as a precondition for recognition of a federal rule of decision." *Id.* Finally, federal common law must be "[t]ethered to a genuinely identifiable (as opposed to judicially constructed) federal policy." *Id.* at 89, 114 S.Ct. 2048. The ADA's preemption clause is unmistakable evidence of a "significant conflict" between a federal policy and the use of state law. *See Sam L. Majors Jewelers*, 117 F.3d at 929 n. 14 ("[B]y enacting the ADA's preemption clause ...

Congress has placed a statutory imprimatur upon federal common law in the limited circumstance of this case."). The ADA's savings provision, 49 U.S.C. § 40120(c), preserving common law remedies, is further evidence that an application of established federal common law to this case would be "[t]ethered to a genuinely identifiable (as opposed to judicially constructed) federal policy." *O'Melveny & Myers*, 512 U.S. at 89, 114 S.Ct. 2048. Finally, we have already specifically held in this circuit that federal common law applies to the carriage contract of an air carrier, noting that the "deregulation of air carriers in 1978 did not change the applicability or substantive content of the relevant federal common law." *Deiro*, 816 F.2d at 1365; *see also Read–Rite*, 186 F.3d 1190.

Thus, if this case had arisen outside the Warsaw Convention, there is no question that this circuit and all others that have considered the question would look to federal common law to determine whether the limited liability provision in the contract is enforceable. On that issue, federal common law is, in the words of *Zicherman*, "the law that would govern in the absence of the Warsaw Convention." 516 U.S. at 229, 116 S.Ct. 629.

The majority believes that its approach is supported by the Second Circuit's decision in *Brink's Ltd. v. South African Airways*, 93 F.3d 1022, 1028 (2d Cir.1996), but *Brink's* is inapposite. *Brink's* applied a New York choice-of-law rule in a case where "wilful misconduct" by the carrier had been alleged and a pass-through to domestic law was required. That choice-of-law rule directed the court to apply South African substantive law. *Id.* at 1031 ("Under any analysis, the Republic of South Africa clearly is the center of gravity of this dispute, and has the greatest interest in having its law applied to this controversy." (citation omitted)). If there had been a federal common law of choice of law, the Second Circuit in *Brink's* should have looked to that law. But despite the hopes of many conflicts scholars, there is no federal common law of choice of law.[2] Instead, we have in the United States an essentially chaotic system in which a multitude of different choice of law systems are employed by different states.[3] Only one circuit has found a federal common law of choice of law in Warsaw Convention cases, and I view that decision as of questionable validity in light of *Zicherman*. *See Bickel v. Korean Air Lines Co.*, 83 F.3d 127, 130 (6th Cir.1996) (holding that the Warsaw Convention "embodies a concrete federal policy of uniformity and certainty which would be undermined by the use of state choice of law rules" (citation omitted)). But whether *Bickel* is right or not, it is clear that the Second Circuit in *Brink's* did not follow a federal common law of choice of law or even consider whether there was such a law. Rather, it simply followed the only law it believed available, the New York state choice-of-law rule, which directed it to the substantive law of South Africa.

The majority cannot apply California law in this case without violating the Supreme Court's instruction in *Zicherman*. The majority has failed to confront the fact that federal common law has been used, in both federal and state courts, to determine the validity of limitation of liability clauses

---

2. *See, e.g.,* Donald T. Trautman, *Toward Federalizing Choice of Law*, 70 Tex. L.Rev. 1715 (1992); Michael H. Gottesman, *Draining the Dismal Swamp: The Case for Federal Choice of Law Statutes*, 80 Geo. L.J. 1 (1991); Daniel C.K. Chow, *Limiting* Erie *in a New Age of International Law: Toward a Federal Common Law of International Choice of Law*, 74 Iowa L.Rev. 165 (1988); Harold W. Horowitz, *Toward a Federal Common Law of Choice of Law*, 14 U.C.L.A. L.Rev. 1191 (1967).

3. Herma Hill Kay, *Theory into Practice: Choice of Law in the Courts*, 34 Mercer L.Rev. 521, 585 (1983) (finding that among the fifty states the following analytically identifiable choice of law tests are applied singly or in combination: "center of gravity," "governmental interest," "comparative impairment," "most significant relationship," "better law," "principles of preference," "functional," "lex fori," and "traditional vested rights").

928

for close to eighty years, and that this court has applied the very rule of federal common law at issue in this case in *Read-Rite*, *Deiro* and *Klicker*. This federal common law rule is clearly the law that "would govern in the absence of the Warsaw Convention," *Zicherman*, 516 U.S. at 229, 116 S.Ct. 629, and it should be followed here.

## III

The established federal common law of this circuit is that theft of cargo by an employee of the common carrier will invalidate a contractual limitation of liability only if the theft was for the carrier's own use or gain. In *Glickfeld*, 213 F.2d at 724 (9th Cir.1954), plaintiff Glickfeld, like plaintiff Zomaya in this case, alleged that an employee of the carrier had stolen part of his shipment. The district court, however, found that the goods had not been converted by the carrier, and granted summary judgment for the amount stipulated in the carriage contract. *Id.* Glickfeld appealed, arguing that conversion by an employee or even a third party should be imputed to the carrier. *Id.* at 727. This court upheld limited liability, saying,

> [T]he cases are uniform in holding that the conversion doctrine is pertinent only when there has been a true conversion, i.e., where the carrier has appropriated the property for its own use or gain. The carrier may properly limit its liability where the conversion is by third parties or even by its own employees.

*Id.*

In *Deiro*, we relied on our decision in *Glickfeld* to hold that "[u]nder the federal common law only an appropriation of property by the carrier for its own use will vitiate limits on liability," and that "if a liability limitation is valid ... recovery for damage cannot exceed the released value regardless of the degree of the carrier's negligence." *Deiro*, 816 F.2d at 1366. Other circuits agree. In a case surveying the law of several circuits before and after airline deregulation, then-Chief Judge

Breyer of the First Circuit relied upon *Deiro* and wrote that "in the absence of some special indication, courts will not impute to commercial parties (agreeing to a liability limitation) an intent to litigate the degree to which loss-causing negligence was ordinary, gross, or egregious." *Hill*, 996 F.2d at 1317, 1319–20 (1st Cir.1993). Chief Judge Breyer noted that *Glickfeld* might be an exception to this rule, since *Glickfeld* suggests that "the willful nature of misconduct might make a difference," such as the carrier stealing cargo for its own benefit. *Id.* at 1320.

The rule laid down in *Glickfeld* and *Deiro* is "the law that would govern in the absence of the Warsaw Convention." *Zicherman*, 516 U.S. at 229, 116 S.Ct. 629. Because there is no allegation that FedEx misappropriated the plaintiff's property for its own use, the theft of cargo by FedEx employees is insufficient to "vitiate limits on liability" contained in the contract. *Deiro*, 816 F.2d at 1366.

## IV

This is an important case because of the majority's rationale for the result. For virtually all of this century, California has been forbidden from regulating the liability of interstate common carriers for lost or damaged cargo. In particular, air carriers have been regulated (and later deregulated) by federal statutes, and the validity of limited liability provisions of their contracts has been determined under federal common law. But under the majority's rationale, the California legislature, prompted by shippers or insurers, is now free to mandate full liability for theft of international shipments by employees of air carriers, irrespective of any contractual provision to the contrary. At the same time, however, because of federal common law and statutory preemption, California is forbidden to apply such a rule to domestic interstate shipments. The majority's rationale is probably wrong as a matter of policy. More important, and for our pur-

poses controlling, it is wrong as a matter of law.